# STATE v. L. B. McKINLEY.

232 N. W. 2d 906.

September 5, 1975—No. 45537.

*Pierre N. Regnier,* City Attorney, and *Thomas R. Hughes* and *Beryl A. Nord,* Assistant City Attorneys, for appellant.

*Mark Reinhardt,* Legal Assistance of Ramsey County, Inc., for respondent.

*Randall D. B. Tigue* and *Barbara Kehrberg,* Law Student, for Minnesota Civil Liberties Union, amicus curiae, seeking affirmance.

SCOTT, JUSTICE.

This is an appeal from an order of the St. Paul municipal court dismissing a charge against defendant for operating an automobile after cancellation of his driving privileges. The basis of the dismissal was that the court lacked jurisdiction because the seizure of defendant was in violation of the Fourth Amendment of the United States Constitution and of Article 1, § 10, of the Minnesota Constitution. The city of St. Paul appeals in the name of the state. We affirm.

On April 7, 1974, about 6 p. m., during daylight hours, defendant, L. B. McKinley, was operating an automobile in an alley in the city of St. Paul. The trial court found that he was driving the automobile in a lawful manner and within the 10-miles-per-hour alley speed limit prescribed by city ordinance. Officer John Ballis of the St. Paul Police Department was proceeding south with his partner, Officer Jan Pitman. Ballis saw the McKinley car in the alley, stopped his squad car, backed up, and pulled into the alley. McKinley parked his automobile in a parking stall behind an apartment building and got out. Officer Ballis parked his squad car behind McKinley's car and directed McKinley to approach the squad car and display his driver's license. McKinley told the officer that he did not have his driver's license in his possession. Officer Ballis directed McKinley into the rear seat of the squad car. Before getting in, he was subjected to a patdown for weapons. Officer Pitman then radioed the police dispatcher and requested a check of McKinley's driver's license. The check disclosed that McKinley's license had been canceled and, since no warrants were outstanding for his arrest, McKinley was tagged for driving after cancellation.

The record shows, and the trial court found, that at no time prior to the stop did either officer observe any unlawful or suspicious conduct on the part of McKinley, nor was either aware that McKinley's driver's license had been canceled. Further, the record discloses that defendant was seized and his freedom of movement suspended during the procedure described above. Tes-

timony indicates that the officers would have detained him initially had he disregarded their summons, and that, once inside the squad car, defendant could not open the rear doors because they had no handles.

The issue presented is simply whether or not this seizure of defendant under the circumstances discussed herein constituted a violation of the Fourth Amendment to the Constitution of the United States and of Article 1, § 10, of the Constitution of the State of Minnesota.

A necessary preliminary to the ultimate decision rendered here is a discussion of the state's contention that police officers are authorized by statute to stop a motor vehicle or driver for the purpose of a routine driver's license check. Minn. St. 171.08 provides in pertinent part: ,

"Every licensee shall have his license in his immediate possession at all times when operating a motor vehicle and shall display the same, upon demand of a justice of the peace, a peace officer, an authorized representative of the department, or by an officer authorized by law to enforce the laws relating to the operation of motor vehicles on public streets and highways; * * *."

The state would have us conclude, in effect, that the constitutional mandate which the court found had been ignored in the procedures employed by the police officers is subordinate to the regulatory police power of the state. On the contrary, we are of the opinion that existing constitutional guidelines as developed and expanded in recent years support our conclusion that the validity, in application, of the statute depends wholly upon whether such application is consistent with these constitutional standards.

We therefore need not rely upon the narrow factual distinction that defendant was not operating his automobile when summoned by the officers and asked to display his license, so as to bring his conduct within the purview of the statute, but had rather alighted from his vehicle after having been observed by

the officers. Any conclusion as to applicability of the statute based only on those facts is clearly of no consequence, for if persons authorized to act under the statute do so in any factual setting the constitutional standards embodied in U. S. Const. Amend. IV and Minn. Const. art. 1, § 10, must prevail and are themselves determinative of the reasonableness and validity of the seizure.

Further, we lend no credence to the suggestion that Minn. St. 171.08 is unconstitutional, for if constitutional requirements are satisfied in its implementation, the statute will clearly both survive the test of constitutionality and accomplish the legislative intent.

In the landmark decision, the United States Supreme Court in Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. ed. 2d 889 (1968), discussed fully the Fourth Amendment mandates regarding searches and seizures and carefully drew an exception to established principles based upon the practical necessity of a procedure known as a "stop and frisk." The court stated:

"* * * We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispell his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U. S. 30, 88 S. Ct. 1884, 20 L. ed. 2d 911.

A further conclusion by the court was that this limited search and its attendant procedures did constitute a seizure under traditional standards:

"* * * It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the stationhouse and prosecution for crime—'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U. S. 16, 88 S. Ct. 1877, 20 L. ed. 2d 903.

In summary, the court in Terry and its two companion cases, Sibron v. New York and Peters v. New York, 392 U. S. 40, 88 S. Ct. 1889, 20 L. ed. 2d 917 (1968) (reported as one opinion), concluded that, in order to except the stop and frisk from the constitutional protection of the Fourth Amendment, several preliminary conditions must be present, which include the requirement that the police officer observe unusual conduct which leads him reasonably to conclude, in light of his experience, (1) that criminal activity may be afoot and (2) that the individual whose suspicious behavior the officer is investigating at close range is armed and presently dangerous to the officer or to others. The satisfaction of these conditions will render evidence discovered pursuant to that form of search and seizure referred to as the "stop and frisk" admissible.

This stop and frisk exception, carefully protected from abuse by the necessary preliminary considerations discussed above, is the sole constitutional exception to the requirements of the Fourth Amendment and of Minn. Const. art. 1, § 10, which is of relevance to our determination. A consideration of the procedures employed in the instant case leads to the obvious conclusion that constitutional prerequisites to this limited search and seizure were not present.

Specifically, the court in Terry stated:

"* * * [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U. S. 21, 88 S. Ct. 1880, 20 L. ed. 2d 906.

This doctrine was extended to include other than the street detentions specifically discussed in Terry in the recent case of United States v. Peltier, 422 U. S. 531, 95 S. Ct. 2313, 45 L. ed. 2d 374 (1975), in which the United States Supreme Court reiterated the principle espoused in Almeida-Sanchez v. United States, 413 U. S. 266, 93 S. Ct. 2535, 37 L. ed. 2d 596 (1973), which dealt with a challenge to a roving patrol randomly stopping motor vehicles. The court, in this latter case, concluded:

"* * * It is undenied that the Border Patrol had no search warrant, and that there was no probable cause of any kind for the stop or the subsequent search—not even the 'reasonable suspicion' found sufficient for a street detention and weapons search in *Terry v. Ohio,* 392 U. S. 1, and *Adams v. Williams,* 407 U. S. 143." 413 U. S. 268, 93 S. Ct. 2536, 37 L. ed. 2d 599.

As fully shown in the record, there are no specific and articulable facts upon which the police officers relied to justify the stop and subsequent search of defendant. There is no dispute with the findings of the trial court that the officers neither observed any unlawful or suspicious conduct on the part of defendant nor had knowledge of the cancellation of his driver's license. We therefore hold that the stop and frisk, clearly performed without basis of probable cause or articulable facts, violated the constitutional rights of defendant.

It must be noted that an increasing number of courts have faced challenges to the propriety of "routine license checks" based upon statutory authorization. The state here asserts that this court in State v. Fish, 280 Minn. 163, 159 N. W. 2d 786 (1968), has approved these license checks aimed at insuring the effective enforcement of Minn. St. 171.08. The state is apparently relying upon the following language:

"* * * The essential needs of public safety permit police officers to use their faculties of observation and to act thereon within proper limits. It is not only the right but the duty of police officers to investigate suspicious behavior, both to prevent crime and to apprehend offenders." 280 Minn. 167, 159 N. W. 2d 789.

However, an analysis of the factual setting presented in Fish, as well as that of State v. Scroggins, 297 Minn. 144, 210 N. W. 2d 55 (1973), unlike that presented here, allows the conclusion that the procedures utilized satisfied constitutional standards. The statute therefore was properly applied.

Our decision, based upon Terry and its application to routine license checks, is wholly consistent with the rather broad and encompassing language found in the recent opinion in People v. Ingel, 36 N. Y. 2d 413, 369 N. Y. S. 2d 67, 330 N. E. 2d 39 (1975). Faced in that case with a challenge to routine traffic check procedures employed by police officers in stopping a single automobile traveling on a public highway, the court concluded that stopping without cause or reason or by arbitrary caprice or curiosity is an impermissible intrusion on the freedom of movement. Further, the court held that single nonsystematic stops, such as that presented in the case before us, are limited seizures within the purview of the Fourth Amendment, similar in nature to the "stops" of pedestrians discussed in Terry v. Ohio, *supra*. Governed by such reasoning, the court held that the statutory provision which purports to allow stops of motor vehicles for equipment examination or possible violations is subject to the well-accepted balancing test. The conclusion reached, after weighing the state's interest in public safety against an individual's Fourth Amendment guarantee, was that an intrusion by the state is impermissible absent reasonable suspicion of a violation.

The New York court stated (36 N. Y. 2d 420, 369 N. Y. S. 2d 74, 330 N. E. 2d 44) :

"* * * Indeed, in Pennsylvania an approach quite similar to that taken here was followed [Commonwealth v. Swanger, 453 Pa. 107, 307 A. 2d 875 (1973)] * * *. * * *

"It should be emphasized that the factual basis required to support a stop for a 'routine traffic check' is minimal. An actual violation of the Vehicle and Traffic Law need not be detectable. For example, an automobile in a general state of dilapidation might

properly arouse suspicion of equipment violations. All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity. It is enough if the stop is based upon 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion' (Terry v. Ohio, 392 U. S. 1, 21, 88 S. Ct. 1868, 1880, *supra*)."

We therefore conclude that in the absence of the necessary probable cause or reasonable suspicion, as discussed in Terry v. Ohio, *supra*, State v. Fish, *supra*, and State v. Scroggins, *supra*, the police officers were constitutionally prohibited from conducting this limited search and seizure of defendant.[1]

The decision of the lower court is accordingly affirmed.

Affirmed.

---

[1] See, also, United States v. Ortiz, 422 U. S. 891, 95 S. Ct. 2585, 45 L. ed. 2d 623 (1975), in which the court held that the Fourth Amendment prohibits a border patrol, in the absence of consent or probable cause, from searching private vehicles at traffic checkpoints removed from the border and its functional equivalents. The court then concluded: "* * * We are not persuaded that the differences between roving patrols and traffic checkpoints justify dispensing in this case with the safeguards we required in *Almeida-Sanchez* [v. United States, 413 U. S. 266, 93 S. Ct. 2535, 37 L. ed. 2d 596 (1973)]. We therefore follow that decision and hold that at traffic checkpoints removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause." 422 U. S. 896, 95 S. Ct. 2588, 45 L. ed. 2d 629.

The court, however, in a footnote to Ortiz, left unanswered the particular question presented here: " * * * We also need not decide whether checkpoints and roving patrols must be treated the same for all purposes, or whether Border Patrol officers may lawfully stop motorists for questioning at an established checkpoint without reason to believe that a particular vehicle is carrying aliens. Cf. United States v. Brignoni-Ponce, 422 U. S. 873, 95 S. Ct. 2574, 45 L. ed. 2d 607 [1975]. Nor do we suggest that probable cause would be required for all inspections of private motor vehicles. It is quite possible, for example, that different considerations would apply to routine safety inspections required as a condition of road use." 422 U. S. 897, 95 S. Ct. 2589, 45 L. ed. 2d 629. See, also, United States v. Brignoni-Ponce, *supra,* and Bowen v. United States, 422 U. S. 916, 95 S. Ct. 2569, 45 L. ed. 2d 641 (1975).