**STATE of Minnesota, Respondent,**

v.

**Scott Alan JOHNSON, Appellant.**

**No. 46176.**

Supreme Court of Minnesota.

July 22, 1977.

C. Paul Jones, Public Defender, David M. Gross, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, William B. Randall, County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

PER CURIAM.

Defendant, charged with felonious theft and burglary, attempted at the Rasmussen hearing to have the physical evidence against him suppressed on the ground that it was the fruit of a violation of his Fourth Amendment rights. The district court denied the motion and defendant, apparently believing that his only hope was in challenging the suppression order on appeal from final judgment, waived a jury and agreed to submit the issue of his guilt to the court on a stipulation as to what the state's witnesses would testify to if called. Defendant's convictions and this appeal followed. We reverse on the ground that the decisive evidence of defendant's guilt was the product of a violation of defendant's Fourth Amendment rights.

At 1:30 p. m. on October 29, 1974, an officer of the Maplewood Police Department stopped an automobile driven by defendant. The officer had not observed any traffic violations but stopped defendant because he suspected something was wrong. However, at the Rasmussen hearing the officer was unable to articulate why he became suspicious of the vehicle, saying with commendable candidness, "I can't tell you. I don't know." The best the officer could do was say that something had aroused his suspicion.

While checking defendant's driver's license, the officer smelled the odor of burned marijuana and observed marijuana seeds in the front seat. On the basis of this, he arrested defendant. He then searched the rest of the car and seized an old rifle and a wallet, found in the trunk, which a radio check revealed to have been taken in a recent house burglary. This is the evidence defendant, at the Rasmussen hearing, urged be suppressed.

In *State v. McKinley*, 305 Minn. 297, 232 N.W.2d 906 (1975), this court held that single nonsystematic stops for routine driver's license checks required as justification some specific and articulable suspicion by police of a violation. In so holding, we quoted approvingly the following statement by the New York court in *People v. Ingle*, 36 N.Y.2d 413, 420, 369 N.Y.S.2d 67, 74, 330 N.E.2d 39, 44 (1975):

"It should be emphasized that the factual basis required to support a stop for a 'routine traffic check' is minimal. An actual violation of the Vehicle and Traffic Law need not be detectable. For example, an automobile in a general state of dilapidation might properly arouse suspicion of equipment violations. All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity. It is enough if the stop is based upon 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.' (*Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, [20 L.Ed.2d 889, 906 (1968)])."

Here the officer may well have observed something which reasonably aroused his suspicion but he was unable to articulate what that something was. Because of this, we cannot make an independent determination of whether the officer had reason to suspect some violation by defendant.

Since the stop was illegal, it follows that the evidence which was seized from defendant after the stop should have been suppressed.

Reversed.

YETKA, Justice (dissenting).

The policeman passed the defendant's car on a two-lane highway at about 1:30 p. m. The police car was traveling south; the defendant's car was traveling north. The officer took note of the nature of the occupants of the car, as was his practice. He noticed through his rearview mirror that the defendant's brake lights came on as he passed the defendant's car. The officer had the feeling something was wrong, and made a U-turn to follow the car. He then noticed the defendant's car coming towards him again. Defendant made a left-hand turn in front of the squad car onto an eastbound highway, and the officer made a right-hand turn and pulled in behind his vehicle. The officer could not recall if the defendant just stopped automatically or if the red flashers had been used. The officer got out of his patrol car and approaching defendant, who was standing beside his car, asked him to display his driver's license. From the open front door of defendant's car the officer smelled burning marijuana and noticed marijuana seeds on the front seat. The officer then placed the defendant under arrest for possession of marijuana. He also told the defendant's female companion of the arrest and asked to see her purse, in which he found a 13-inch switchblade knife. Both the defendant and his companion were then placed in the police car. A contemporaneous search of the trunk of the defendant's car revealed a stolen rifle and wallet.

As the majority opinion points out, the factual basis required to support a stop for a "routine traffic check" is minimal. To justify the initial inquiry the officer must at least have specific and articulable facts which would warrant such an intrusion. The evil to be avoided is a stop based on caprice or curiosity. In this case the facts indicate sufficient justification for the officer to stop the defendant and request identification. The officer observed a vehicle make what could reasonably be presumed was an evasive maneuver. The defendant's car must have made a U-turn just after the police car passed it. It is not likely that the defendant could have made that maneuver without violating the traffic laws. The experience of the officer indicated possible problems.

This is not a case of idle police curiosity. The officer needed only sufficient reason to ask the defendant for identification, not probable cause for arrest. Once the defendant was approached, however, probable cause for arrest surfaced. Then and only then was the defendant arrested. This case is thus very much like *State v. Fish*, 280 Minn. 163, 159 N.W.2d 786 (1968). In that case the police stopped the defendant's car for a license check after they saw him drive from a local bar and general store in a rural area at 2:30 a. m., long after the required closing time. While a radio check was being made to determine his driver's license status, the officers received a radio communication that the premises the defendant had been seen leaving had perhaps been

burglarized. By looking into his car they observed a bow and quiver in plain view which matched ones displayed at the inn. At this point, the officers arrested the defendant and searched the car. This court upheld the subsequent search, stating (280 Minn. 169, 159 N.W.2d 791):

> " * * * The state does not contend that when the deputy sheriffs saw defendant drive his automobile from a business premises at the unlikely hour of 2:30 a. m., long after required closing time, that fact alone gave rise to probable cause that a felony had been committed. We agree with the state, however, that that circumstance was sufficient to give rise to an honest curiosity as to the identity of the parties they observed. The officers were within their rights to inquire as to their identity and actions. As competent police officers, it was within the scope of their duties to make such inquiry. We do not understand from our authorities or from the decisions of the United States Supreme Court that when the police exercised their right to make such an inquiry an arrest occurred. The probable cause which gave rise to the arrest and search which followed arose from a sequence of events which occurred while the police were properly in the exercise of their duties. While they were making inquiry as to the identity of defendant and his status as a licensed operator of a motor vehicle, they received a radio communication that the premises from which defendant was seen leaving had perhaps been burglarized, and, during the same interval, this information was confirmed by the youth who had reported the fact to the sheriff's office. By looking into the car, the officers observed merchandise of a similar descrip-

tion to that which they had seen displayed on previous occasions at the Hunter's Inn. Thus, there was shortly an accumulation of circumstances which gave rise to probable cause to believe defendant was involved in the reported burglary. Moreover, the search disclosed the presence of articles in the automobile which it later developed had been taken from the burglarized premises. These included binoculars, a radio, and other telltale evidence of defendant's presence on the premises. We accordingly conclude that the arrest did not occur when defendant was first detained but that the factual circumstances which developed shortly thereafter established probable cause for arrest without a warrant."

As recognized in *State v. McKinley*, 305 Minn. 297, 232 N.W.2d 906 (1975), Minn.St. 171.08 [1] is not exempt from constitutional standards; however, I believe the officer in this case had "reasonable suspicion" to ask the defendant to identify himself within the rationale of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), based on specific and articulable facts. From that point on probable cause was presented while the officer was within the proper scope of his duties.

Since I believe that a partial transcript of the officer's testimony at the Rasmussen hearing is most helpful in explaining his state of mind, I quote therefrom:

"Q   And did you work on that day?

"A   I did.

"Q   Were you at work about 1:30 that afternoon?

"A   Yes, I was.

"Q   What hours did you work on that day?

1.   Minn.St. 171.08 states: "Every licensee shall have his license in his immediate possession at all times when operating a motor vehicle and shall display the same, upon demand of a justice of the peace, a peace officer, an authorized representative of the department, or by an officer authorized by law to enforce the laws relating to the operation of motor vehicles on public streets and highways; however, no person charged with violating the possession requirement shall be convicted if he produces in court or the office of the arresting officer a driver's license theretofore issued to him for the class of vehicle which he was driving and valid at the time of his arrest or satisfactory proof that at the time of the arrest he was validly licensed for the class of vehicle which he was driving. The licensee shall also, upon request of any such officer, write his name in the presence of such officer in order that the identity of the licensee may be determined."

"A 7:00, a. m., to 3:00, p. m.

"Q Please tell the Court where you were about 1:30 on October 29, 1974.

"A I was traveling southbound on Century Avenue at Highwood.

"Q Century is a north-south street?

"A Yes, it is.

"Q And is that in Maplewood, Minnesota?

"A Yes, it is.

"Q And in Ramsey County, Minnesota?

"A Yes.

"Q Is that also a State highway, Century Avenue?

"A Part of it is. I believe that particular section has been turned over to the County, to Ramsey County.

"Q What direction were you going? South?

"A South.

"Q Did you see anything as you were going south on Century near Highwood?

"A Yes, I did.

"Q Describe what you recall at this time, please.

"A I observed a Toyota, it was orange in color, licensed number David Frank 1025, traveling north on Century.

"Q Did you note anything in particular about the speed of that car at that time?

"A For that particular stretch of roadway it was normal speed.

"Q Did you notice anything else about the car or its occupants at that time that you recall now?

"A I did observe the occupants of the vehicle, and, as I went by, I looked in my rear-view mirror, and I noticed the brake lights came on the vehicle.

"Q When you looked in your rear-view mirror, was it the center mirror or side mirror, or don't you recall?

"A I don't recall. I believe it was the center one. That's the one I usually use.

"Q When you looked in the mirror and saw the brake lights, did you see them already on or going on?

"A They went on after the vehicle passed by my squad.

"Q Did you see them go off or not?

"A Yes, I did.

"Q Approximately how long were they on?

"A It was just a very short—a short pressing of the brake.

"Q Was there other traffic that you noticed before you saw and observed and noticed that car, that Toyota?

"A I can recall no other traffic down there.

"Q What attracted your attention to that car at that time, to the best of your recollection, now?

"MR. HARTKE: I will object, Your Honor. The witness has already answered that.

"THE COURT: Overruled. He may answer.

"THE WITNESS: Well, the fact that it was there, it was the only one there, and I—in my routine patrolling I make it a habit to look at as many occupants and as many vehicles as I can.

"Q (By Mr. Poch, continuing): Do you normally concentrate on occupants or vehicles, or what?

"A Well, normally it's on the occupants.

"Q Why do you normally concentrate on occupants?

"A Well, that's where you are going to learn the most about what's going on. The vehicle can tell you nothing. The actions of the occupants, whether or not it be erratic movements or the hiding of the face or whatever, and that's where you're going to get some indication if there's something wrong.

"Q What do you recall now happened inside the car or that the occupants did at that time and place?

"A I can't tell you. I don't know. I don't recall what led me to believe something was, you know, wrong that day.

"Q When you say you don't recall what led you to believe something was wrong, did you have an opinion, or belief, that something was wrong—

"A Yes.

"Q —at some time?

"A Yes, because I made a U turn to go back after the vehicle.

"Q When did you feel that something was wrong?

"A At the moment I looked into the car and, then, after I looked in my rearview mirror following the car and saw that the brake lights went on.

"Q Describe the number of occupants that you recall seeing at first contact?

"A There were two.

"Q Can you describe them any more fully?

"A Well, only that one was a male and one was a female and one of them is in the courtroom right now.

"Q Which one is in the courtroom right now?

"A Scott Johnson, the defendant in the brown jacket, dark brown collar.

"Q How far did you proceed south on Century before you altered your course of movement?

"A The first turn, and that was a matter of a couple hundred feet, until I was out of sight. After I was out of sight I applied my brakes and made a U turn.

"Q That would be less distance than a 300 foot football field?

"A Yes.

"Q What is the terrain like there as far as grade on that particular section of Century Avenue?

"A Well, from the point that I passed the defendant's vehicle it goes up a hill and then around a corner almost like, say, within a couple of hundred feet.

"Q Did you make a U turn approximately 200 feet south of where you first saw that car with the defendant in it?

"A Well, several hundred feet. I wouldn't limit it to 200 exactly.

"Q What happened next?

"A Well, as I made my U turn and went back around the corner, I observed that the defendant's vehicle was coming towards me again.

"Q At that time what were the relative directions of both cars?

"A I was northbound and he was southbound.

"Q Where were you both in reference to Highwood at the time you first saw the Toyota with the defendant in it coming back down?

"A We were—it's almost right at Highwood, in fact, where our cars crossed.

"Q Describe what happened next, please, to the best of your memory?

"A Well, the vehicle was coming southbound on Century and then made a left-hand turn in front of the path of the squad onto eastbound Highwood.

"Q At the time that happened what was the position and movement or lack of movement of your squad car with you in it?

"A After he made a left-hand turn in front of my squad I made a right-hand turn and pulled in behind his vehicle.

"Q When the defendant made a left turn and went east on Highwood, were you moving or stopped?

"A I may have been moving slow. I don't believe I was stopped.

"Q At any time while your car was on Century facing north did you stop and get out of your car?

"A I don't—I'm sure I didn't.

"Q When did you first get out of your car?

"A After I pulled in behind the defendant's vehicle and stopped my squad.

"Q Did you have any blinkers or emergency flasher lights turned on at any time?

"A I don't recall if I actually turned on my red pull-down lamps or if he just stopped automatically, which sometimes happens.

"Q Were you driving a marked squad car?

"A Yes, I was.

"Q How far east on Highwood off Century did the car that you were driving stop, the squad car?

"A Oh, within thirty or forty or fifty feet. It was just a matter of turning around—or turning the corner and stopping, a very short distance.

"Q How far ahead of you was the car stopped that the defendant was in?

"A Oh, I don't know—as best I can recall, within twenty—twenty-five feet of the corner.

"Q What followed?

"A Well, I got out of my squad, and I walked up to the defendant's vehicle, and the defendant had just gotten out of the car and his door was open on the left-hand side, the driver's door.

"Q Was that a two-door or four-door?

"A It was—I believe it was a two-door.

"Q How far open was the driver's door when you got up to the defendant?

"A As I recall, it was all the way open.

"Q And where were you and the defendant—

"A Standing next—

"Q —with reference to that door?

"A Standing next to that door."

I firmly believe that one of the best characteristics of a good law officer is an instinct, a built-in radar, or a "gut feeling," if you will, and the courage to act on that instinct. The resultant stopping of the car and discovery is proof of the fact that the officer had the right instinct in this case.

The majority opinion is a step in the wrong direction since it will either discourage an officer from acting in situations where we should encourage him to act or, worse, it will encourage an officer to manufacture reasons for acting as he did once he is called upon to explain his actions. The latter result tends to undermine the integrity of our entire law enforcement system.

I would therefore affirm the trial court.