STATE of Minnesota, Respondent,

v.

Robert J. BAUMANN, Appellant.

No. C3–99–2161.

Court of Appeals of Minnesota.

Sept. 12, 2000.

Mike Hatch, Attorney General, St. Paul, MN; and Alden Hofstedt, Coon Rapids City Attorney, Tammi A Fredrickson, Assistant City Attorney, Coon Rapids, MN (for respondent).

Ann N. Cathcart, Special Assistant State Public Defender, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN (for appellant).

Considered and decided by RANDALL, Presiding Judge, HARTEN Judge, and HALBROOKS, Judge.

## OPINION

HARTEN, Judge

Appellant Robert Baumann challenges his DWI conviction, asserting that the district court erred in holding constitutional the stop of his vehicle based on the presence of special series license plates and the warrantless entry into his garage. He also challenges the constitutionality of Minn. Stat. § 168.0422 (1998) (permitting stops of vehicles bearing special series license plates without reasonable, articulable suspicion). We affirm.

## FACTS

On March 19, 1999, at 7:10 p.m., Coon Rapids Police Officer J. Urquhart overheard a radio transmission from a sheriff's deputy regarding the sighting of a white Chevrolet Corsica with plates bearing the letters "WX." According to Urquhart, the deputy stated that the "registered owner had had warrants and was canceled IPS [inimical to public safety]." Urquhart stated that he did not recall hearing the

car's license plate number or the driver's gender.

Later, that night, at 1:41 a.m., Urquhart was on patrol approximately one mile from the area described in the earlier radio transmission. He observed a white Chevrolet Corsica with special license plates beginning with "WX." Urquhart knew that such plates were issued due to past alcohol-related driving offenses.

Urquhart followed the vehicle and entered its license plate information into the patrol car's onboard computer. As he waited for the information to come up on the computer, the vehicle turned into a townhouse driveway, and a garage door opened. Urquhart then turned and followed the vehicle into the driveway with his red squad car lights activated. As the car pulled into the garage and the garage door began to close, Urquhart exited his squad car and ran under the door. The driver, later identified as Robert Baumann, exited his vehicle, and Urquhart asked him for his driver's license. Baumann replied that he did not have one. Urquhart then asked Baumann for some form of identification, and Baumann produced his Minnesota photo identification card.

Baumann was charged with six gross misdemeanor DWI violations: three under Minn.Stat. § 169.121 (1998), and three under Minn.Stat. § 169.129 (1998). Baumann stipulated to certain facts and moved to suppress the evidence and dismiss the charges based on his assertion that the police stop of his vehicle and the warrantless entry into his garage were unconstitutional. The district court denied his motion.

Pursuant to *State v. Lothenbach,* 296 N.W.2d 854, 858 (Minn.1980), Baumann pleaded not guilty, stipulated to the facts, and agreed to a bench trial. He was found guilty of aggravated DWI, having an alcohol concentration of .10 or more in violation of Minn.Stat. § 169.129, subds. 1, 2(a), and the other counts against him were dismissed. He was sentenced to one year in prison, eight months of which were stayed. This appeal followed.

## ISSUES

1. Was the stop of appellant's vehicle constitutional?

2. Were appellant's Fourth Amendment rights violated when the officer entered appellant's garage without a warrant?

## ANALYSIS

■ In reviewing pretrial suppression orders, the appellate court independently reviews the facts and determines, as a matter of law, whether the district court erred in its decision. *State v. Harris,* 590 N.W.2d 90, 98 (Minn.1999).

### 1. Constitutionality of the Stop

Baumann asserts that Minn.Stat. § 168.0422 (1998), which permits stops of vehicles bearing special series license plates [1] without reasonable suspicion of a crime, is unconstitutional. Baumann argues that the officer's stop of his vehicle was also unconstitutional.

■ Constitutional questions need be decided by this court only as necessary to dispose of the case presented. *State v. Hoyt,* 304 N.W.2d 884, 888 (Minn.1981). Because we conclude that Baumann's con-

---

1. Special series license plates permit the continued operation of a vehicle that has its registration plates impounded because a driver and/or owner committed certain driving offenses. Minn.Stat. § 168.041, subd. 6(a), .042, subd. 12 (1998). Both statutory subdivisions authorize special series plates if (1) the violator or owner has a limited license, (2) the owner is not the violator and has a valid license, or (3) a member of the owner's household has a valid license. *Id.* Special series plates may also be issued under Minn.Stat. § 168.041, subd. 6(a), if someone in the violator's household has a valid driver's license and may be issued under Minn.Stat. § 168.042, subd. 12, if the violator has an identified qualified licensed driver.

viction can be sustained on other grounds, it is unnecessary to reach the constitutionality of Minn.Stat. § 168.0422.[2]

■ "[T]he factual basis required to support the stop for a routine traffic check is minimal." *State v. Johnson*, 257 N.W.2d 308, 309 (Minn.1977) (quotation omitted). In order to conduct a *Terry* stop for limited investigatory purposes, an officer must have reasonable articulable suspicion of criminal activity. *State v. Munson*, 594 N.W.2d 128, 136 (Minn.1999). The stop must be

> not the product of mere whim, caprice, or idle curiosity [but rather] based upon specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.

*Johnson*, 257 N.W.2d at 309 (quotation omitted).

■ *State v. Pike*, 551 N.W.2d 919, 922 (Minn.1996) upheld as constitutional the stop of a suspect's vehicle based on a routine computer check of the suspect's license plates, which indicated that the vehicle's registered owner's license had been revoked.

> It is not unconstitutional for an officer to make a brief, investigatory, *Terry*-type stop of a vehicle if the officer knows that the owner of the vehicle has a revoked license so long as the officer remains unaware of any facts which would render unreasonable an assumption that the owner is driving the vehicle.

*Id.* Once an officer obtains information that tends to show the owner of the vehicle is not the individual driving the vehicle, however, reasonable suspicion ceases. *Id.*

■ Here, as in *Pike*, the officer's stop of Baumann's vehicle was based on more than "mere whim, caprice or idle curiosity." *Johnson*, 257 N.W.2d at 309. The

officer had received information earlier in his shift that a white Chevrolet Corsica with WX plates had been seen in the immediate area, and he was aware that special series plates are issued to those with a history of DWI offenses. Additionally, the officer knew that the registered owner "had had warrants" out for his or her arrest and "was canceled IPS." Although the officer may not have been certain that the vehicle he stopped was the same vehicle seen earlier in the evening, this was a reasonable inference. The vehicle descriptions were identical, and the stopped vehicle was first observed only a mile from the reported earlier sighting. On these facts, Urquhart's stop was supported by reasonable and articulable suspicion.

**2. Warrantless Entry in Appellant's Garage**

■ The Fourth Amendment of the United State Constitution and Article 1, Section 10 of the Minnesota Constitution prohibit unreasonable searches and seizures of "persons, houses, papers and effects." In order for an arrest to be made after a warrantless entry or search of a person's home, the state must demonstrate the existence of either (a) consent or (b) probable cause and exigent circumstances. *State v. Paul*, 548 N.W.2d 260, 265 (Minn. 1996). It is undisputed that Baumann did not consent to Urquhart's entry.

■ But Urquhart had sufficient probable cause to justify entry into Baumann's garage. Probable cause is found when police demonstrate that they "reasonably could have believed that a crime was being committed by the person arrested." *Id.* (quotation omitted). Urquhart was aware that (a) a vehicle matching Baumann's vehicle was seen in the area earlier in the evening; (b) the driver of the vehicle seen earlier in the evening had a li-

---

**2.** In *State v. Greyeagle*, 541 N.W.2d 326 (Minn.App.1995), we held that officers could not lawfully stop vehicles based solely on the observation of special series license plates on the vehicle. The legislature enacted Minn.

Stat. § 168.0422 subsequent to this court's decision in *Greyeagle*. We need not resolve whether this statute has effectively overruled *Greyeagle*.

cense which was canceled as IPS; (c) the driver "had had warrants"; and (d) Baumann failed to stop and closed the garage door on Urquhart despite Urquhart's activation of his squad car's overhead lights. Taken together, the totality of the circumstances indicates that probable cause existed at least for obstruction of legal process, a misdemeanor, under Minn.Stat. § 609.50, subd. 1 (1998).[3]

Second, exigent circumstances in the form of "hot pursuit" were also present in this situation. Police in hot pursuit may follow a fleeing suspect and enter into a dwelling in the absence of a warrant. *State v. Koziol,* 338 N.W.2d 47, 48 (Minn.1983) (citing *United States v. Santana,* 427 U.S. 38, 43, 96 S.Ct. at 2406, 2410, 49 L.Ed.2d 300 (1976)). Further, "a person may not defeat a warrantless arrest which has been set in motion in public by entering into his dwelling." *Id.* Although Urquhart followed for only a short distance with his squad car lights activated, the "hot pursuit" doctrine applies regardless of whether officers conduct "a high speed chase of the suspect * * * or merely approach a suspect who immediately retreats into a house." *Paul,* 548 N.W.2d at 265.

## DECISION

The district court did not err by denying Baumann's motion to suppress. The police stop of Baumann's vehicle was based on reasonable, articulable suspicion of criminal activity given the totality of the circumstances. When Baumann entered his garage, the police officer was engaged in "hot pursuit" and had probable cause to believe that Baumann had committed a crime. The officer's entry into the garage was not unconstitutional.

**Affirmed.**

**3.** Baumann argues that the police did not charge him with obstruction of legal process. But whether or not Baumann was charged with obstruction of legal process is not controlling. The fact that the charge was objectively available answers the inquiry for proba-

RANDALL, Judge (concurring specially).

I concur in the result. I agree with the majority that there is enough in the record to affirm the district court without having to reach the constitutional challenge to Minn.Stat. § 168.0422 (1998). However, the constitutionality of that statute as a major issue does not "lurk beneath the surface," but is right there on the surface and should be addressed.

The Commissioner of Public Safety is authorized to issue special-series license plates ("WX or WY") to designate vehicles that have had their regular registration plates impounded for driving violations by the driver and/or owner. Minn.Stat. §§ 168.041, subd. 6(a), .042, subd. 12 (1998). The commissioner is permitted to issue special-series plates if (a) the violator or owner has a limited driver's license; (b) the owner is not the violator and the owner has a valid license; or (c) a member of the owner's household has a valid license. *Id.* Minn.Stat. § 168.041, subd. 6(a), also permits the commissioner to issue special-series plates if a member of the violator's household has a valid license, and Minn. Stat. § 168.042, subd. 12, permits issuance if the violator has a qualified licensed driver.

As the majority correctly notes, in *State v. Greyeagle,* 541 N.W.2d 326, 330 (Minn. App.1995), we held that officers could not lawfully stop vehicles based *solely* on their observation of special-series license plates on the vehicle. In *Greyeagle,* we found no articulable suspicion of criminal activity, just a stop based on the presence of the marked license plate. *Id.* at 328.

Following this court's ruling in *Greyeagle,* the Minnesota legislature passed Minn.Stat. § 168.0422.1997 Minn. Laws 1st

ble cause purposes. *See State v. White,* 489 N.W.2d 792, 794 (Minn.1992) ("Under the objective test of probable cause which we use, the issue is whether there was objective probable cause to arrest.").

Spec. Sess. ch. 2, § 20. The new statute provided for the previously lacking suspicionless stops, based *solely* on the presence of special series license plates. Minn. Stat. § 168.0422 provides:

A peace officer who observes the operation of a motor vehicle within this state bearing special series registration issued under section 168.041, subd. 6 * * * may stop the vehicle for the purpose of determining whether the driver is operating the vehicle lawfully under a valid driver's license.

Minn.Stat. § 168.0422 is a legislative attempt to specifically overrule the holding in *Greyeagle* that the mere presence of special plates does not, by itself and without more, constitute articulable suspicion that the driver is engaged in criminal activity. That ruling in *Greyeagle* is self-evident. A car with special plates is legally licensed to be on the highways. That is why the Commissioner of Public Safety issues them. The commissioner is not in the habit of issuing license plates, which cause a driver to be in violation of the law the second the driver puts the car on the road.

I recognize legislative concern over "career criminals." Special-series plates (commonly known as WX/WY plates) are only issued when the driver/owner has compiled a serious enough driving record to have his regular plates impounded. But "concern over public safety" does not override the Fourth Amendment of the Bill of Rights[4] or Article I, Section 10 of the Minnesota Constitution.[5]

The Minnesota Supreme Court ruled on a similar issue (public policy versus the state constitution) in *Ascher v. Commissioner of Pub. Safety,* 519 N.W.2d 183 (Minn.1994). In *Ascher,* the state used checkpoints/road blocks in a target zone where there were law enforcement concerns about alcohol-impaired car drivers. *Id.* at 184. The state had to concede that the officers had absolutely no idea that a stopped motorist was driving while alcohol impaired. They might discover "alcohol impairment" after the suspicionless stop, but Minnesota's Constitution does not authorize "suspicionless stops" at sobriety checkpoints. *See id.* at 187 (concluding Minnesota Constitution prohibits suspicionless stops at sobriety checkpoints despite U.S. Supreme Court's determination in *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 456, 110 S.Ct. 2481, 2488, 110 L.Ed.2d 412 (1990), that U.S. Constitution does not prohibit such checkpoints).

It is settled that a person's prior record is never by itself sufficient to provide reasonable suspicion justifying a Terry stop. *See United States v. Sandoval,* 29 F.3d 537, 542 (10th Cir.1994) (stating that no case found suggesting contrary). It is *equally clear* that a legislative body cannot supersede judicial decisions interpreting and applying a constitution. *See Dickerson v. United States,* —— U.S. ——, ——, 120 S.Ct. 2326, 2332, 147 L.Ed.2d 405 (2000) (stating "Congress may not legislatively supersede our decisions interpreting and applying the Constitution" (citation omitted)).

Stops of motorists must be based on individualized suspicion and must not be discriminatory. *Ascher,* 519 N.W.2d at 186. In this case, the officer had absolutely no idea when he saw appellant's "WX"

---

4. The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue but upon probably cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

5. Article 1, Section 10 of the Minnesota Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

plates that a person driving the car did not have a legal license. He would only know that if he made a suspicionless stop and inquired. *The same is true of all vehicles moving on the highways.* We know a certain percentage of all cars on Minnesota roads, at any given time, are being driven by people without valid licenses and/or without insurance. But an officer does not know whether a particular driver is violating these laws unless the officer makes a stop and asks the driver for proof of license and insurance. If the officer makes the stop without a valid articulable suspicion of criminal activity, the illegal stop cannot be made lawful, after the fact, by a determination that the driver does not have insurance or a valid license.

Absent a duly authorized constitutional amendment, which has not yet happened to the Fourth Amendment of the Bill of Rights or Article 1, Section 10 of the Minnesota Constitution, a state legislature is incapable of overriding a constitutional interpretation made by a state court. In the case of federal law, the U.S. Congress cannot override constitutional interpretation by federal courts.

This constitutional evidentiary issue presented itself in *Dickerson.* The relevant setting in *Dickerson* is as follows: In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the U.S. Supreme Court held that certain warnings had to be given to a suspect before any incriminating statements made by him during custodial interrogation could be admitted in evidence. Just two years after *Miranda* was decided, the U.S. Congress enacted 18 U.S.C. § 3501, which purported to state that confessions would be admissible evidence if voluntarily given. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, § 701, 82 Stat. 197, 210–11 (1968) (codified as amended at 18 U.S.C. § 3501 (1994)). Voluntariness would be decided under 18 U.S.C. § 3501 with or without the giving of the Miranda warning. That statute lay idle for approximately 30 years as the justice department

and law enforcement must have realized that the U.S. Congress probably cannot overrule the U.S. Supreme Court and its interpretation of the Bill of Rights. Then law enforcement decided to give it a try and found a federal appellate court to go along with them in upholding the constitutionality of 18 U.S.C. § 3501. The U.S. Supreme Court took the case on certiorari and said, "No, you can't do that."

In *Dickerson,* the majority stated:

Given § 3501's express designation of voluntariness as the touchstone of admissibility, its omission of any warning requirement, and the instruction for trial courts to consider a nonexclusive list of factors relevant to the circumstances of a confession, we agree with the Court of Appeals that Congress intended by its enactment to overrule *Miranda.* Because of the obvious conflict between our decision in *Miranda* and § 3501, we must address whether Congress has constitutional authority to thus supersede *Miranda.* If Congress has such authority, § 3501's totality-of-the-circumstances approach must prevail over *Miranda's* requirement of warnings; if not, that section must yield to *Miranda's* more specific requirements.

The law in this area is clear. This Court has supervisory authority over the federal courts, and we may use that authority to prescribe rules of evidence and procedure that are binding in those tribunals.

*Dickerson,* —— U.S. at ——, 120 S.Ct. at 2332 (citations omitted).

The U.S. Supreme Court realized that Congress has legislative powers but pointed out the limitations on those legislative powers. *Dickerson* stated:

Congress retains the ultimate authority to modify or set aside any judicially created rules of evidence and procedure that are not required by the Constitution.

But Congress may not legislatively supersede our decisions interpreting and applying the Constitution.

*Id.* (citations omitted). The majority closed by stating:

In sum, we conclude that *Miranda* announced a constitutional rule that Congress may not supersede legislatively. Following the rule of *stare decisis,* we decline to overrule *Miranda* ourselves. The judgment of the Court of Appeals is therefore *Reversed.*

*Id.* at 2336–37 (footnote omitted).

The limitation on Congress to legislatively supersede the Bill of Rights has its counterpart in the limitation on a state legislature to legislatively supersede the Bill of Rights or its own state constitution. In this case, Minnesota's relevant constitutional guarantee against improper stops and seizures is in the Minnesota Constitution, Article 1, Section 10.

Minn.Stat. § 168.0422 is a statute authorizing a "mark" or a "brand" to be placed on a citizen's vehicle license plate. That mark labels that vehicle's driver as one who can be stopped, not for articulable suspicion of criminal activities, but rather because of the "mark." That is impermissible. *See United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (recognizing investigatory stop must be justified by objective manifestation that person stopped is or is about to be, engaged in criminal activity).

You might as well make the mark a pink triangle or some other identifying object. The results are exactly the same. A citizen is now marked because "the collective wisdom of the government" designates that citizen a part of a class of citizens, the members of which, because of perceived prior injurious conduct, have now been ruled to be less than full citizens. As less

than full citizens, they are denied the full rights of being a citizen.[6]

We have no law, for instance, that says if you have five or more prior armed robberies, you are now deemed a "career criminal in armed robbery," and, thus, your car must bear the prefix "ARCC" (armed robbery career criminal) and that special plate, that special mark, allows the authorities to stop you merely for having that mark and question you about any recent bank robberies. We have no law stating that if you are a career criminal with multiple burglaries, your car or your house must be marked with "BCC" (burglary career criminal), which allows officers to stop your car because of the mark and allows officers to enter your home without a search warrant, without probable cause, without exigent circumstances, or without hot pursuit and allows those officers to seize and question you in your home about recent burglaries in your neighborhood.

We also do not have, for instance, a statute stating that if you are adjudged a career criminal in sexual or physical assaults, you retain the right to go to trial on your next offense with a private attorney of your own choosing, but you do not have the right to a public defender.

The Bill of Rights and the Minnesota Constitution have no memory. To illustrate, assume a coin has been flipped ten times and has landed heads up ten straight times. On the 11th flip, the odds remain exactly one out of two that it will land heads up. The coin does not remember there were ten previous heads up in a row, and the coin does not equalize that statistical oddity by now forcing itself to come down tails up. So it is with constitutional guarantees that carefully shield individual liberty. Each and every time you are

**6.** A leading commentator on the Fourth Amendment wrote:

But those with prior arrests and prior convictions must be allowed to live in the world without the risk of constant harassment, and thus there is no room for an

exception to the rule that a brief seizure for investigation may not be based solely upon an individual's past record.

4 Wayne R. LaFave, *Search and Seizure* § 9.4(f) at 192–93 (3d ed.1996) (footnotes omitted).

arrested for a crime and brought to justice, each individual guarantee surrounds the citizen once again.

It is not that career criminals do not feel the effects of lengthy criminal records. If they take the stand to testify on their own behalf, a felony criminal record can be used to impeach their credibility. If they are lawfully convicted, a lengthy criminal history score will hurt them badly at sentencing in Minnesota. All states, when there is discretion in sentencing, give a sentencing judge the right to impose a lengthier sentence for someone with a criminal history score than for someone convicted of exactly the same crime who has no criminal history score. Habitual offender statutes that severely penalize criminal defendants with lengthy prior convictions are on the books in almost all states. See e.g., Minn.Stat. § 609.1095, subds. 2 (permitting increased sentences for dangerous offenders who commit third violent crime), 3 (requiring mandatory sentence for third violent felony), 4 (1998) (permitting aggravated-durational departure to statutory maximum sentence for sixth felony offense).

But the process leading up to sentencing, meaning the arrest, the gathering of evidence, and the trial, give to every citizen, even those with a record, the full array of constitutional rights. In Ascher, the "mark" or "brand" was (a) driving a car and; (b) driving a car in a zone targeted for random road block stops to check you out for alcohol-impaired driving. Those random stops were forcefully struck down. Ascher quoted from Justice Brennan's dissent in Michigan Dep't of State Police v. Sitz, in which he stated:

"Some level of individualized suspicion is a core component of the protection the Fourth Amendment provides against arbitrary government action. By holding that no level of suspicion is necessary before the police may stop a car for the purpose of preventing drunken driving, the Court potentially subjects the general public to arbitrary or harassing conduct by the police."

Ascher, 519 N.W.2d at 185 (quoting Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 457–58, 110 S.Ct. 2481, 2489, 110 L.Ed.2d 412 (1990) (Brennan J., dissenting) (citation omitted)). The Ascher court recognized the laudability of determining alcohol-impaired drivers but clearly found that "public policy" has no place in overriding a citizen's constitutional guarantees. Ascher goes on to state:

The real issue in this case is not, as some might phrase it, whether the police conduct in question is reasonable in some abstract sense, nor is it whether the police procedure is in some sense effective. Rather, the issue is whether the state has met its burden of articulating a persuasive reason for departure from the general requirement of individualized suspicion * * *.

Id. at 186.

In sum: (a) Ascher tells us that the same constitutional guarantees surrounding all citizens accused of all crimes surround those suspected of impaired driving; (b) "public policy" does not trump the U.S. Bill of Rights or the Minnesota State Constitution; and (c) Dickerson tells us that when it comes to interpreting constitutional guarantees, the judiciary retains primacy over the legislative process.

As stated in the beginning, I concur in the result because the result can be reached without deciding the seminal issue of the constitutionality of Minn.Stat. § 168.0422. But I write specially because that statute is behind the facts of this case. That statute is now alive and abroad on Minnesota highways.

Whenever a society marks or brands its citizens because of past conduct and then decrees those citizens less than full citizens, and, thus, entitled to less than full rights, we have not just taken one step down the slippery slope toward a police state. Rather, we have taken four giant steps and are on our way toward a mindless rush into fascism. As the Nazi party was coming to power in Germany during the 1930s (before September 1, 1939 when the real agenda of the Third Reich became

known), the government was careful to come down hard on pickpockets, thieves, rapists, and murderers; gypsies; and ethnic groups. I suggest that if you stopped the average man or woman on the streets of a German town in those days, they would have said, "I didn't know that was happening, but it sounds like a good idea to me. It is about time!"

If you are going to "mark" or "brand" a citizen's car or his home because of past criminal conduct, go ahead if you can come up with a sound, defensible public-policy reason to justify it. We do, after all, require inmates of county jails and state prisons to wear distinctive garb (while a few may not, the majority of penal institutions do). But please remember that wearing the distinctive garb is neither a crime in and of itself nor articulable suspicion that you are now engaged in new criminal activity.

If Minnesota is going to trash the Bill of Rights, why do we concentrate on traffic offenses, which are misdemeanors and gross misdemeanors? Wouldn't it be better "public policy" to mark all citizens who have lengthy felony records and subject them to random suspicionless stops?