*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1304**

James Fletcher Cameron, petitioner,
Appellant,

vs.

Commissioner of Public Safety,
Respondent.

**Filed June 8, 2015
Affirmed
Bjorkman, Judge**

Stearns County District Court
File No. 73-CV-13-6011

Greg A. Engel, St. Cloud, Minnesota (for appellant)

Lori Swanson, Attorney General, Jeffrey S. Bilcik, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Reyes, Presiding Judge; Hudson, Judge; and Bjorkman, Judge.

**U N P U B L I S H E D   O P I N I O N**

**BJORKMAN**, Judge

Appellant challenges the revocation of his driver's license, arguing that the evidence of his alcohol concentration should have been suppressed because the stop of

his vehicle was not justified by reasonable suspicion of criminal activity and there was no probable cause to arrest him for driving while impaired. We affirm.

## FACTS

At 1:30 a.m. on June 23, 2013, Cold Spring Police Sergeant Chris Boucher was on patrol in St. Augusta as an annual town festival was drawing to an end. Sergeant Boucher saw a vehicle driven by appellant James Cameron exit a parking lot in front of him and initiated his squad-car video camera. Immediately after turning into the road, the vehicle drifted to the centerline and then back toward the fog-line. Sergeant Boucher followed the vehicle for almost a mile and observed it weave within its lane several more times. Sergeant Boucher also saw the vehicle drift to the right and then come close to a concrete median as it turned left onto an entrance ramp to Interstate 94. Sergeant Boucher stopped the vehicle before it entered the highway.

Cameron was slow to acknowledge Sergeant Boucher's presence, but when he did roll down his window, Sergeant Boucher immediately detected an "overwhelming" odor of alcohol. Sergeant Boucher noticed that Cameron's speech was slurred, his eyes were bloodshot and watery, and his pupils were dilated. Cameron admitted that he had been drinking since 10:00 p.m. Cameron refused to perform field sobriety tests. Sergeant Boucher did not separately ask him to take a preliminary breath test. Sergeant Boucher arrested Cameron, and a subsequent breath test revealed an alcohol concentration of .19. Cameron was charged with driving while impaired (DWI), and respondent Minnesota Commissioner of Public Safety revoked his driving privileges.

2

Cameron petitioned for judicial review, arguing that drifting within his lane did not provide reasonable suspicion for the stop and that there was no probable cause to arrest him for DWI based on the totality of the circumstances. At the implied-consent hearing, Sergeant Boucher testified about his observations and that, based on his experience, Cameron's driving conduct was consistent with impairment.

In sustaining the license revocation, the district court found that Cameron's vehicle "almost turn[ed] into the opposite lane of traffic when it exited the parking lot" and "[his] vehicle was not traveling in a straight line but moving from side to side within his lane of traffic for almost a mile . . . coming into contact or near contact with the centerline on several occasions." And the district court concluded that the "totality of the circumstances, combined with Sergeant Boucher's experience and judgment" established probable cause to arrest Cameron for DWI.

In the criminal DWI proceeding, a different district court judge made contrary findings and suppressed the alcohol-concentration evidence. Cameron moved to vacate the revocation order. The district court denied the motion, concluding that it was not bound by a ruling in a separate criminal proceeding and that Cameron otherwise failed to present any new evidence showing the license revocation was in error. Cameron appeals the revocation of his license.[1]

---

[1] Cameron does not challenge the denial of his motion to vacate.

**D E C I S I O N**

### I. The stop of Cameron's vehicle was supported by reasonable suspicion that Cameron was driving while impaired.

Law enforcement must have a reasonable, articulable suspicion of criminal activity to conduct a brief investigatory stop of a vehicle. *State v. Richardson*, 622 N.W.2d 823, 825 (Minn. 2001). An officer's observation of a traffic violation, no matter how insignificant, generally "forms the requisite particularized and objective basis for conducting a traffic stop." *State v. Anderson*, 683 N.W.2d 818, 823 (Minn. 2004). And Minnesota appellate courts have consistently held that swerving or weaving within the lane of travel is a sufficient basis to stop a vehicle. *See, e.g.*, *State v. Kvam*, 336 N.W.2d 525, 528 (Minn. 1983) (stating that officer who observes a driver weaving within his lane in an erratic manner is justified in stopping the driver to investigate); *State v. Dalos*, 635 N.W.2d 94, 96 (Minn. App. 2001) (holding that continuous weaving within the lane for one-half mile provides reasonable suspicion of criminal activity). But a single, isolated swerve, *State v. Brechler*, 412 N.W.2d 367, 369 (Minn. App. 1987), or "subtle" weaving alone is insufficient. *Warrick v. Comm'r of Pub. Safety*, 374 N.W.2d 585, 585-86 (Minn. App. 1985). When examining the validity of a stop, courts consider the totality of the circumstances and recognize that law-enforcement officers are permitted to make inferences that would be beyond the competence of an untrained person. *Kvam*, 336 N.W.2d at 528.

We review a district court's determination that there was reasonable suspicion to justify a stop de novo. *State v. Britton*, 604 N.W.2d 84, 87 (Minn. 2000). But we review

4

the district court's findings of fact for clear error, giving weight to the inferences drawn from those facts. *State v. Lee*, 585 N.W.2d 378, 383 (Minn. 1998). Findings of fact are clearly erroneous when they are "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *Schulz v. Comm'r of Pub. Safety*, 760 N.W.2d 331, 333 (Minn. App. 2009) (quotation omitted), *review denied* (Minn. Apr. 21, 2009).

Cameron first challenges the district court's findings that his vehicle almost turned into the wrong lane when it exited the parking lot and came into "contact or near contact" with the centerline several times while drifting within its lane. Cameron argues that the squad-car video does not support these findings and calls Sergeant Boucher's testimony into question. We begin our analysis by observing that the existence of a video recording does not change our role as an appellate court. The fact-finder—here, the district court—weighs the evidence, judges the credibility of witnesses, and draws reasonable inferences from the facts. We determine whether the evidence supports the factual findings. On balance, we conclude that it does in this case.

Turning to the challenged findings, we agree with Cameron that the squad-car video does not support the district court's finding that Cameron almost turned into the wrong lane of traffic when he exited the parking lot. But the video and Sergeant Boucher's testimony both support the district court's findings that Cameron's vehicle came into "near contact" with the centerline several times and weaved within its lane prior to the stop.

5

Sergeant Boucher testified that he followed Cameron's vehicle for a mile and saw it weaving within its lane on several occasions. He stated that when Cameron's vehicle turned in front of him out of the parking lot it "drifted towards the center line" and then "almost immediately, drifted to the fog line." He also described how the vehicle "drifted to the right" as it entered the left turn lane and then "got extremely close . . . to the concrete barrier" just before executing the left turn onto the freeway entrance ramp. More generally, Sergeant Boucher testified that it seemed as though "whoever was driving [the] vehicle was fighting the vehicle" and "[i]t would drift one direction, only to come back towards the other direction."

The squad-car video likewise shows Cameron's vehicle drifting within his lane at least four times. Some instances are more pronounced than others, such as when Cameron first turns out of the parking lot, and later when his vehicle drifts close to the concrete median before turning onto the I-94 entrance ramp. The quality of the recording makes it difficult to ascertain whether Cameron's vehicle actually touched the centerline. But it appears to have at least come close to doing so several times. We have repeatedly recognized that an experienced officer is more attuned to suspicious driving conduct and deference should be afforded to this training and expertise. *See Richardson*, 622 N.W.2d at 825 (acknowledging that trained law-enforcement officers are permitted to make inferences and deductions that would be beyond competence of untrained person). It is undeniable that Sergeant Boucher was in the best position to observe and draw inferences from Cameron's driving conduct. On this record, we conclude that there was sufficient evidence to support the district court's findings that Cameron's vehicle weaved within its

lane several times over the course of a mile, at times coming close to touching the centerline.

Cameron next asserts that the totality of the circumstances does not justify the stop of his vehicle. We disagree. As noted above, weaving within one's lane of traffic can provide reasonable suspicion for a stop. *Dalos*, 635 N.W.2d at 96. And while there may be possible innocent explanations for this driving conduct, this does not mean it cannot serve as a basis to suspect criminal activity. *State v. Pike*, 551 N.W.2d 919, 921 (Minn. 1996) (holding that an actual traffic violation is not necessary to justify a stop); *State v. Johnson*, 444 N.W.2d 824, 826 (Minn. 1989) ("[I]nnocent activity might justify the suspicion of criminal activity."). Sergeant Boucher explained that Cameron's driving conduct seemed "unusual" and was consistent with impaired driving he has observed in the past. Indeed, Sergeant Boucher's ability to articulate why the specific driving behavior he saw led him to suspect impaired driving demonstrates that the stop was based on more than "mere whim." *Cf. State v. Johnson*, 257 N.W.2d 308, 309 (Minn. 1977) (quotation omitted).

Other circumstances also support the validity of the stop. The stop occurred around 1:30 a.m.—a time at which it is reasonable to suspect that unusual driving conduct results from impairment. *See, e.g.*, *State v. Engholm*, 290 N.W.2d 780, 784 (Minn. 1980) (stating stop was valid based on vehicle traveling at exceptionally slow speed and weaving within its lane shortly after local bars had closed). Moreover, Sergeant Boucher initiated the stop in the area where a town festival was ending. Cameron's presence in the area of this well-attended festival supports the reasonable

7

inference that any unusual driving behavior was due to impairment from alcohol consumption at the event.

In sum, we acknowledge that this is a close case. But reasonable suspicion is a minimal standard. *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008). The video evidence depicts Cameron's vehicle drifting within its lane multiple times. Sergeant Boucher's observations and testimony that in his experience such conduct is consistent with impaired driving, support a reasonable suspicion of illegal driving conduct. Accordingly, we discern no error in the district court's determination that there was reasonable suspicion to stop Cameron.

## II.    There was probable cause to arrest Cameron for DWI.

The determination of probable cause is a mixed question of law and fact. *State v. Kier*, 678 N.W.2d 672, 678 (Minn. App. 2004), *review denied* (Minn. June 15, 2004). We review a district court's findings of fact for clear error and its legal conclusion de novo. *State v. Horner*, 617 N.W.2d 789, 795 (Minn. 2000). "The test of probable cause to arrest is whether the objective facts are such that under the circumstances a person of ordinary care and prudence [would] entertain an honest and strong suspicion that a crime has been committed." *State v. Wynne*, 552 N.W.2d 218, 221 (Minn. 1996) (alteration in original) (quotation omitted). Recognized indicia of impairment include an odor of alcohol, bloodshot and watery eyes, slurred speech, and an uncooperative attitude. *Kier*, 678 N.W.2d at 678.

Cameron argues that there was not probable cause to arrest him for DWI, pointing to two inconsistencies between Sergeant Boucher's testimony and the squad-car video.

8

First, Sergeant Boucher testified that he had to knock on the car window to get Cameron's attention, but the video shows that Sergeant Boucher never knocked on the window. Second, Cameron contends the squad-car video discredits Sergeant Boucher's testimony that Cameron was unsteady on his feet once he exited his vehicle. We are not persuaded.

The existence of these limited inconsistencies does not alter the fact that the evidence of Cameron's impairment is overwhelming. Sergeant Boucher testified that Cameron displayed many indicia of intoxication, including his slow response to the officer's approach and initial refusal to roll down his window or turn off his stereo; his difficulty rolling down the window and producing his insurance card; the overwhelming odor of alcohol from Cameron and the vehicle; and his slurred speech, bloodshot and watery eyes, and dilated pupils. And Cameron admitted that he had been drinking since 10:00 p.m. Many of these indicia of intoxication could not be captured by the squad-car video. In relying on Sergeant Boucher's testimony regarding these details, the district court implicitly found this testimony credible. We defer to such credibility determinations. *State v. Klamar*, 823 N.W.2d 687, 691 (Minn. App. 2012).

Alternatively, Cameron asserts that he was improperly arrested for failing to perform field sobriety tests, including a preliminary breath test. We disagree. First, Cameron's outward manifestations of intoxication provided a sufficient objective basis to arrest him. *See Holtz v. Comm'r of Pub. Safety*, 340 N.W.2d 363, 365 (Minn. App. 1983) (stating an officer needs only one objective indication of intoxication to constitute probable cause to believe a person is under the influence). Second, nothing in the record

indicates that Cameron was arrested for refusing a field sobriety or preliminary breath test.  Rather, Sergeant Boucher testified that he arrested Cameron because he believed he was impaired.  Based on our careful review of the record, we conclude that there was probable cause to arrest Cameron for DWI.

**Affirmed.**