**Ricky Francis ASCHER, Respondent,**

v.

**COMMISSIONER OF PUBLIC SAFETY, petitioner, Appellant.**

No. C3–93–364.

Supreme Court of Minnesota.

June 30, 1994.

Rehearing Denied Aug. 9, 1994.

0910, and we were not asked to review this

Hubert H. Humphrey, III, Atty. Gen., Nancy J. Bode, Asst. Atty. Gen., St. Paul, for appellant.

Faison T. Sessoms, Jr., Minneapolis, for respondent.

OPINION

COYNE, Justice.

The issue in this appeal is whether the state has met its burden of establishing con-

claim.

stitutional justification for police use of temporary roadblocks to stop cars and investigate a large number of drivers in the hope of discovering that some of them are alcohol-impaired. We hold that it has not met its burden and that such roadblocks violate Minn. Const. art. I, § 10.

This case arises from a roadblock that the Burnsville Police Department and the Minnesota State Patrol conducted at the intersection of Nicollet Avenue and Highway 13 in Burnsville from 10:00 p.m., Friday, August 14, 1992, to 2:00 a.m., Saturday, August 15, 1992. The supervising patrol officer testified that the location was chosen because it is a "high accident area" and a site where there is a "high inciden[ce] of DWI violations." He testified that the purposes of the roadblock were apprehension and deterrence.

Officers directed vehicles from Nicollet or Highway 13 into a "pre-screen area" just off the intersection. Signs along the road warned drivers approaching the roadblock, but the drivers could not circumvent it. Officers briefly interviewed all drivers, looking for "indicia of intoxication" and making sure each driver possessed a valid license. Those whom the police suspected of a violation were directed into a "final screen area" for further investigation, including field sobriety tests and a computer check for outstanding warrants. Initially, officers were instructed to stop all cars entering the checkpoint. Later, because of unusually heavy traffic on Highway 13, the ranking officers decided to stop only every fourth car on that road.

As the State Patrol routinely does with its enforcement measures, it notified media representatives of the roadblock. According to the supervising officer, the presence of members of the media helps reassure those who "happen to get caught up in it" and the resulting publicity helps deter potential violators. Two local television stations covered the roadblock, using lights and cameras to film parts of the procedure. All filming was done in the final screen area where those suspected of DWI were tested. Within that area, according to the supervising officer, the police "didn't tell them what they could or could not shoot."

A Burnsville police officer was performing final screenings when Ricky Ascher was directed into the final screen area. After the officer observed physical indicia of intoxication, the officer directed Ascher to perform several field sobriety tests, and then directed him to take a preliminary breath test. After placing Ascher under arrest and reading him the implied consent warning, the officer took Ascher to the police station. Ascher tried but failed to contact an attorney before finally stating that he refused to submit to an Intoxilyzer test.

The roadblock resulted in 14 DWI arrests (1.4% of all stops), four arrests for DAR/DAS, one arrest for an open bottle violation, one arrest for cocaine possession, one arrest for driving an unregistered vehicle, and one arrest of a fugitive. In all, 2.3% of those stopped were cited or arrested. Another officer measured the delays experienced by a sample of motorists. He timed eight of the 975 vehicles and determined that the average delay among them was under 2 minutes. In preparation for the roadblock, the supervising officer consulted with senior officers in the Burnsville Police Department, the Dakota County Sheriff's Department and the State Patrol but not with any directly-elected officials.

The court of appeals reversed the order of the district court sustaining the revocation of Ascher's license; it concluded (1) that, in view of the presence of the media, the sobriety roadblock was impermissibly intrusive under the Fourth Amendment of the United States Constitution and (2) that the roadblock violated Minn. Const. art. I § 10. *Ascher v. Commissioner of Pub. Safety*, 505 N.W.2d 362 (Minn.App.1993).

Until 1968 the United States Supreme Court upheld a "seizure" of the person under the Fourth Amendment only if the police officer making the seizure had probable cause. In that year the Court recognized an exception to the probable cause requirement, holding that police may temporarily seize a person to investigate suspected criminal wrongdoing if the police have objective, individualized articulable suspicion of criminal wrongdoing by that person. *Terry v. Ohio,*

392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In recognizing this exception, the Court relied upon the so-called "balancing test." As later articulated in *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979), this test provides that if a seizure of a person is less intrusive than an arrest of the person, the reasonableness of the seizure under the Fourth Amendment depends upon a weighing or balancing of "[1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty."

In *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the United States Supreme Court, in a decision written by Chief Justice Rehnquist, used this test in concluding that use of temporary roadblocks to stop and investigate all drivers in the hope of catching some alcohol-impaired drivers does not violate the Fourth Amendment.

The Court began its analysis by stating the obvious: "No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." 496 U.S. at 451, 110 S.Ct. at 2485. Conversely, the Court declared the intrusion involved in stopping a motorist at a temporary roadblock to investigate possible alcohol-impaired driving is slight on the Fourth Amendment scale of intrusions. *Id.* at 451–53, 110 S.Ct. at 2485–86. The Court then addressed "the degree to which the seizure advances the public interest," suggesting that roadblocks of this sort would be impermissible only if the state advanced *no* empirical evidence of effectiveness. *Id.* at 454, 110 S.Ct. at 2487. Pointing to evidence that such roadblocks result in drunken driving arrests of around one percent of all motorists stopped, the Court held that the state had established effectiveness. *Id.* at 455, 110 S.Ct. at 2487. In summary, the Court said, "the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program." *Id.*

Dissenting, Justice Brennan, joined by Justice Marshall, agreed that a balancing analysis was appropriate but disagreed with the Court's application of the balancing test. Justice Brennan stated:

[T]he [majority] opinion reads as if the minimal nature of the seizure *ends* rather than begins the inquiry into reasonableness. Once the Court establishes that the seizure is "slight," * * * it asserts without explanation that the balance "weighs in favor of the state program." * * * The Court ignores the fact that in this class of minimally intrusive searches, we have generally required the government to prove that it had reasonable suspicion for a minimally intrusive seizure to be considered reasonable. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 661 [99 S.Ct. 1391, 1400, 59 L.Ed.2d 660] (1979); *United States v. Brignoni–Ponce*, 422 U.S. 873, 882–83 [95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607] (1975); *Terry v. Ohio*, 392 U.S. 1, 27 [88 S.Ct. 1868, 1883, 20 L.Ed.2d 889] (1968). Some level of individualized suspicion is a core component of the protection the Fourth Amendment provides against arbitrary government action. [Citations omitted]. By holding that no level of suspicion is necessary before the police may stop a car for the purpose of preventing drunken driving, the Court potentially subjects the general public to arbitrary or harassing conduct by the police.

*Id.* at 457–58, 110 S.Ct. at 2489. Because the state had failed to establish that continued adherence to the traditional requirement of individualized suspicion would be impractical or ineffective, Justice Brennan concluded that the state had failed to meet its burden of justifying making an exception to the requirement. *Id.* at 458, 110 S.Ct. at 2489.

Also dissenting, Justice Stevens, joined by Justices Brennan and Marshall, pointed to the state's failure to establish that a higher arrest rate could not be achieved by following the requirement of individualized suspicion. *Id.* at 461–62, 469, 110 S.Ct. at 2491, 2495 ("there is absolutely no evidence that [the number arrested of those stopped] rep-

resents an increase over the number of arrests that would have been made by using the same law enforcement resources in conventional patrols"). In his view, the majority's decision undervalues the citizen's interest in freedom of movement and freedom from unwanted intrusion and overvalues law enforcement's interests and needs. *Id.* at 462–63, 110 S.Ct. at 2491–92. Moreover, "sobriety checkpoints are elaborate, and disquieting, publicity stunts" and "unannounced investigatory seizures are, particularly when they take place at night, the hallmark of regimes far different from ours." *Id.* at 468–69, 475, 110 S.Ct. at 2495, 2498.[1]

Both the Brennan and the Stevens dissents carefully distinguished *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the only case in which the Supreme Court had previously upheld a practice subjecting the general public to "suspicionless seizures." In *Martinez–Fuerte* the Court had approved the use of permanent interior border checkpoints on major highways where "the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens." *Id.* at 557, 96 S.Ct. at 3083. A smuggler who wished to avoid the checkpoint would be forced to travel on less efficient roads where traffic is lighter and slower, making the smuggler more vulnerable to particularized observation and to detection by roving patrols. Moreover, as Justice Stevens points out, "[t]here is no reason why smuggling illegal aliens should impair a motorists's driving ability, but if intoxication did not noticeably affect driving ability it would not be unlawful. Drunken driving, unlike smuggling, may thus be detected absent any checkpoints." *Sitz,* 496 U.S. at 472, 110 S.Ct. at 2497.

It is sometimes true that the adequacy of a test—in this case, the balancing test—depends on how it is applied. We agree with a critic that the Court's application of the *Brown* balancing test in *Sitz* represents a "radical"[2] departure from the way the test has been and should be applied, with the result that for Fourth Amendment purposes police, in effect, are allowed to decide the reasonableness of their own conduct.

Moreover, the Court's approach is reductional. The general rule is that stops of motorists must be based on individualized suspicion. A corollary of that rule is that stops must not be discriminatory. The Court seems to have concluded that as long as stops are not discriminatory—that is, as long as everyone is stopped—stops need not be based on individualized suspicion. This in effect allows the corollary to supplant the basic guarantee of the rule. Nadine Strossen, Michigan Department of State Police v. Sitz: *A Roadblock to Meaningful Judicial Enforcement of Constitutional Rights,* 42 Hastings L.J. 285, 370 (1991).

The real issue in this case is not, as some might phrase it, whether the police conduct in question is reasonable in some abstract sense, nor is it whether the police procedure is in some sense effective. Rather, the issue is whether the state has met its burden of articulating a persuasive reason for departure from the general requirement of individualized suspicion—as by showing, for example, (a) that it is impractical to require the police to develop individualized suspicion and that a departure from the individualized suspicion requirement will significantly help police achieve a higher arrest rate than they can achieve using more conventional means of apprehending alcohol-impaired drivers and (b) that this outweighs the interests of ordinary citizens in not having their privacy or their freedom of movement interfered with by police investigators who do not have any reason to suspect them of wrongdoing.

It seems to us quite possible that a substantial segment of our society would willingly suffer the short term intrusion of a sobriety checkpoint stop in order to remove drunken drivers from the road. "But consensus that a particular law enforcement

---

1. "Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Brinegar v. United States,* 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting).

2. Note, 104 Harv.L.Rev. 129, 267 (1990).

technique serves a laudable purpose has never been the touchstone of constitutional analysis." *Sitz*, 496 U.S. at 459, 110 S.Ct. at 2490 (Brennan, J., dissenting).

Exercising our independent authority to interpret our own state constitution to protect the rights of the citizens of Minnesota, *Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983), we have engaged in a judicial determination of the reasonableness of the use of a temporary roadblock to stop a large number of drivers in the hope of discovering evidence of alcohol-impaired driving by some of them and have concluded that it violates Minn. Const. art. I, § 10, which we have long held generally requires the police to have an objective individualized articulable suspicion of criminal wrongdoing *before* subjecting a driver to an investigative stop. Based primarily on the state's failure to meet its burden of articulating a persuasive reason for dispensing with the individualized suspicion requirement in this context, we conclude that the constitutional balance must be struck in favor of protecting the traveling public from even the "minimally intrusive" seizures which occur at a sobriety checkpoint.

We limit the retroactive application of this decision to pending cases—that is, to any case pending on June 30, 1994, the date of the decision—in which the issue of the constitutionality of the sobriety checkpoint under the Minnesota Constitution has been properly raised in a timely fashion.

Affirmed.

TOMLJANOVICH, Justice (dissenting).

I respectfully dissent because I disagree with the majority's use of the state constitution to find sobriety checkpoints unconstitutional.

I believe that if we were to apply the balancing test enunciated in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), and adopted in *Michigan Dep't of State Police v. Sitz*, sobriety checkpoints would pass muster under the Fourth Amendment of the United States Constitution.

No one can doubt the public concern over drunk drivers on our highways. The road-block here was more effective in identifying alcohol impaired drivers than that found permissible in *Sitz* and the intrusion was slight. Here the average time a motorist was detained was under two minutes, hardly burdensome when balanced against safety on the highway.

The language of Minn. Const. art. 1, § 10 is identical to that of the Fourth Amendment. We have held that we may be required to interpret our own constitution more stringently than the federal constitution, "but we certainly do not do so lightly." *State v. Hamm*, 423 N.W.2d 379, 382 (1988). In view of the overwhelming importance of public safety, I would not find the minimal intrusion of a sobriety checkpoint one of those areas that require the use of the state constitution.

KEITH, Chief Justice (dissenting).

I join Justice Tomljanovich's dissent.