STATE of Minnesota, Appellant,

v.

**Marvin Russell LARSEN, Respondent.**

No. C5–01–980.

Court of Appeals of Minnesota.

Dec. 26, 2001.

Mike Hatch, Attorney General, St. Paul, and G. Paul Beaumaster, Rice County Attorney, Nathaniel J. Reitz, Assistant County Attorney, Faribault, for appellant.

Samuel A. McCloud, Carson J. Heefner, McCloud & Boedigheimer, P.A., Circle K, Shakopee, for respondent.

Considered and decided by RANDALL, Presiding Judge, AMUNDSON, Judge, and HARTEN, Judge.

## OPINION

R.A. RANDALL, Judge.

The state challenges a pretrial order that dismissed charges of petty misdemeanor possession of marijuana and fishing with an extra line. The evidence to support those charges was obtained by a Minnesota conservation officer who entered and searched respondent's ice-fishing house with no articulable suspicion, no probable cause, no search warrant, no issue of hot pursuit, and the search and seizure did not come under any other exception. We conclude that an individual using an ice-fishing house for personal recreational purposes has a reasonable expectation of privacy. We find no law granting extrajudicial powers to conservation officers that makes them exempt from constitutional guarantees of fairness and due process. We affirm.

## FACTS

An officer of the Minnesota Department of Natural Resources (DNR) entered the ice-fishing house occupied by respondent Marvin Larsen to see if respondent was properly licensed. As in the other ice-fishing house cases that our courts have examined, the method of entry used here was the common method employed by conservation officers when entering ice-fishing houses or dark houses.[1] That method is for the officer to put one hand on the door handle, knock on the door, and say, "Department of Natural Resources Conservation Officer," or words to that effect, and simultaneously pull open the door and enter the fish house. The layman's term "barging in" is accurate. The entry is simultaneous with the announcement of identification, and consent is not asked for, specifically because the state and the conservation officer take the position that consent is irrelevant.

After the officer observed what appeared to be an unlit marijuana cigarette, he conducted a pat-down search of respondent and located a small amount of marijuana. The officer also noticed that respondent had three lines in the water when only two are permitted.

Respondent was charged with possession of a small amount of marijuana and with using too many fishing lines. He moved to have the charges dismissed on the ground that the officer's entry violated respondent's Fourth Amendment rights because he had a reasonable expectation of privacy in his fish house. The district court granted respondent's motion to suppress the evidence and dismissed the charge. The state now appeals.

## ISSUE

Did the warrantless search of respondent's fish house violate his reasonable expectation of privacy?

## ANALYSIS

Respondent's fish house was searched without a warrant pursuant to Minn.Stat. § 97A.215, subd. 3(1)(2000), which provides that a conservation officer may inspect the premises of an activity requiring a license under the game and fish laws, and to Minn.Stat. § 97C.355, subd. 2 (2000), which requires that ice-fishing houses be licensed. The district court held that this search violated respondent's reasonable expectation of privacy and suppressed the evidence obtained during the search. Both parties agree that the suppression of the evidence had a critical impact on the state's ability to proceed with the case against respondent; thus, the issue is ripe for appeal. *See State v. Scott,* 584 N.W.2d 412, 416 (Minn.1998) (stating that when state appeals from pretrial suppression order, it must show that suppressed evidence had critical impact on state's ability to prosecute successfully).

This court recently reviewed the identical issue, i.e., whether evidence obtained in a warrantless search of an ice-fishing house (where the state claimed no exception to the warrant requirement applied) must be suppressed, and concluded that it must. *State v. Krenz,* 634 N.W.2d 231 (Minn.App.2001). In *Krenz,* a DNR officer entered a fish house without a warrant, observed a small pipe that appeared to be a device for smoking controlled substances, and retrieved several containers of cocaine

---

1. The two terms are so similar that they are often used interchangeably. "Ice-fishing house" is commonly used when the fisherman is angling, meaning using fishing lines, and "dark house" is commonly used when the fisherman is using a fish spear. To keep the terminology simple, this opinion will hereafter use the generic term "fish house" to explain the issue.

from a hole in the ice where they had been thrown. Krenz admitted that he smoked cocaine with the pipe, that the pipe belonged to him, and that it contained cocaine; he was charged with one count of controlled substance-crime in the fifth degree. Krenz moved to suppress the evidence and his own statements on the grounds that the search and seizure were unlawful. Krenz's motion was granted and the state appealed.

This court accepted the district court's reasoning that

> because the solid walls of a fish house provide visual privacy for a range of legitimate activities that can take place in a fish house, an expectation of privacy in a fish house is reasonable.

*Id.* at 234. We then affirmed the district court's conclusion

> that because Krenz had a legitimate expectation of privacy in his fish house, [the DNR officer's] entry into the fish house without consent, a warrant, probable cause, or an articulable basis for suspicion violated the Fourth Amendment of the United States Constitution.

*Id.*

*Krenz* goes on to quote *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 472, 142 L.Ed.2d 373 (1998), for a definition of a reasonable expectation of privacy:

> [an expectation] that has a source outside of the fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.

*Krenz,* 634 N.W.2d at 234 (quotations omitted).

Although the state concedes that *Krenz* is very close to the case before us, the state attempts to raise new arguments, and old arguments from *Krenz* clothed in a different hue. The case is of statewide importance. Annually, the state of Minnesota sells more than one million licenses and permits for recreational activities, including, but not limited to, fishing licenses, fish-house permits, hunting licenses, permits to gather wild rice, and other related activities. Thus, we will review each of the state's arguments.

## I. Right of privacy

■ The state argues that occupants of fish houses, unlike other building structures, have no expectation of privacy and, thus, the normal constitutional constraints on law enforcement investigation, detention, and search and seizure do not come under the Fourth Amendment to the U.S. Constitution and to the Minnesota Constitution, Article I, Section 10.

We disagree firmly with the state. The courts' and legislature's definition of the term "dwelling" covers fish houses. *See, e.g.,* Minn.Stat. § 609.581, subd. 3 (2000) (defining "dwelling" in the context of burglary). "Dwelling" means a building used as a permanent or *temporary residence. Id.*

For decades, case law has included within this definition much more than single-family homes. *See, e.g., State v. Walker,* 319 N.W.2d 414, 417 (Minn.1982) (determining that structure attached to dairy barn that provided shelter for calves and would shelter people from the elements was a building); *State v. Vredenberg,* 264 N.W.2d 406, 407 (Minn.1978) (holding that houseboat cabins were suitable for human shelter and therefore were buildings); *State v. Bronson,* 259 N.W.2d 465, 465–66 (Minn.1977) (concluding that basketball arena being converted to ice arena was a building, even though one wall had been removed when burglary was committed); *State v. Gerou,* 283 Minn. 298, 302, 168 N.W.2d 15, 17 (Minn.1969) (concluding steel warehouse used as shelter by those who worked in it was a building); *State v.*

*Edwards*, 589 N.W.2d 807, 811 (Minn.App. 1999) (finding apartment of recently deceased tenant who had been murdered in apartment was "dwelling"), *review denied* (Minn. May 18, 1999); *State v. Hofmann,* 549 N.W.2d 372, 375 (Minn.App.1996) (holding motor home was building within meaning of burglary statute because it was suitable for affording shelter to human beings), *review denied* (Minn. Aug. 6, 1996); *State v. Hendrickson,* 528 N.W.2d 263, 265–66 (Minn.App.1995) (concluding definition of "dwelling" in burglary statute includes appurtenant structures), *review denied* (Minn. Apr. 27, 1995); *In re Welfare of R.O.H.,* 444 N.W.2d 294, 294–95 (Minn.App.1989) (concluding mini-storage unit without heat, electricity, or plumbing could nevertheless afford shelter for human beings and thus was a building within meaning of burglary statute). The courts recognize and accept that, for purposes of burglary, both "building" and "dwelling" are broadly defined. The law confers an expectation of privacy on a wide range of structures.

■ Here, a word needs to be said about just what is a "fish house," meaning an ice-fishing house or a fish house. Just like the word "home," no single word describes the simplicity or the complexity, the amount of space or the lack of space, or the presence of amenities or the lack of amenities that may exist in a fish house. While some fish houses are basically canvas and/or thin wood enclosed shed-type structures, it is not uncommon for fish houses to have a rudimentary and, at times, even a sophisticated-type interior heating system. While ice fishing can take place during the day, it can also commonly take place during hours extending well after midnight and into the next day. It is not uncommon for a fish house, even a simple one, to contain a cot for resting and sleeping. Fish houses often contain chairs, portable radios, and portable televisions. Many fish houses are built larger and for more than the basic one or two holes in the ice. Some have the equivalent of beds, televisions, refrigerators, and some elementary method of heating food. The occupant of a fish house has an expectation of privacy exceeding that of someone sitting in a car or an open fishing boat.

The district court's memorandum of law in *Krenz* is instructive.

> The range of legitimate activities that can take place in a fishhouse which people could expect to be private is greater than the range of activities that can reasonably be done privately in a car. Lakes are usually less crowded than highways, and the solid walls of a fishhouse offer more visual privacy than the windows of a car. Society should also accept that expectation of privacy as reasonable. The risks of harm to the citizens of this state from a fishhouse are far less than the risks involved with a boat or car.

*State v. Krenz,* No. K7–00–1214, slip op. at 8 (Minn.Dist.Ct. Mar. 16, 2001); *see also In re Welfare of R.O.H.,* 444 N.W.2d at 294–95 (concluding a mini-storage unit without heat, electricity, or plumbing could nevertheless afford shelter for human beings and thus was a building within meaning of burglary statute). Thus, if the seminal test for a dwelling in the context of the serious crime of burglary is that the structure needs only to be able to "afford shelter for human beings," then certainly fish houses, whether simple or elaborate, provide shelter for human beings. As a matter of fact, the state concedes that fish houses provide shelter for human beings, but it then dismisses the argument by calling fish houses "just shelters from the wind." We conclude that an enclosed shelter from the wind, the cold, and the eye of the public, where one can fish, sleep, eat,

watch television, and cook (depending on how much work the occupant puts into the shelter) fits the definition of "able to provider shelter for human beings."

The state cannot have it both ways. The state cannot logically charge a citizen with the serious crime of burglary when the structure is not even close to the definition of a home and then claim that a person who is in a structure that cannot be classified as a permanent residence, has no expectation of privacy, not even a limited amount, and, thus, is "outside constitutional guarantees."

*Krenz* framed the issue of warrantless inspections of ice-fishing houses.

> The question is not, at this stage at least, whether these inspections may be made, but whether they may be made without a warrant. For example, to say that gambling raids may not be made at the discretion of the police without a warrant is not necessarily to say that gambling raids may never be made. In assessing whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement, the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant * * *.

*Id.* at 237 (quoting *Camara v. Mun. Court,* 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967) (citation omitted)). There is no basis for distinguishing *Krenz* on this issue. The *Krenz* court did use a term of art, warrant, in its holding, but that does not limit the scope of *Krenz.* In *Krenz,* as here, the state agreed that none of the other exceptions to a warrantless search (e.g., detention based on articulable suspicion of criminal activity followed by evidence in plain sight, probable cause that

a crime was committed, exigent circumstances, hot pursuit of a fleeing criminal) is being claimed by the state.

The state's position is that entry into a fish house by a Minnesota conservation officer needs no justification, but is "built into the law." At oral argument, the state readily conceded that other law enforcement personnel cannot do (to enter a fish house) what they claim conservation officers may do.

Although no case is directly on point as to the facts, we note that the United States Supreme Court has never deviated from a core holding that at least "some justification," such as some articulable suspicion of criminal activity, must accompany a warrantless brief detention and search. In *Bond v. United States,* 529 U.S. 334, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000), the Supreme Court recently compared a probing tactile examination of soft-sided luggage stored by a bus passenger in an overhead luggage compartment to a pat down of a suspect under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Chief Justice Rehnquist's majority opinion stated that the passenger had a reasonable expectation of privacy in his luggage, distinguished between visual and tactile observation, and concluded that the border patrol agent's feeling of the bag in an exploratory manner violated the passenger's Fourth Amendment rights. *Id.* at 377–39, 120 S.Ct. at 1464–65 (emphasis added).

## II. Public waters

■ The state argues that, unlike structures on private or commercial land, fish houses are on public waters [2] controlled by the state, so the normal constitutional guarantee of at least some limited expectation of privacy in a structure does not

---

**2.** Fishing includes "angling in the summer" and "ice fishing in the winter."

apply. We have no idea where the state came up with this argument. The state knows well that in addition to lakes, the State of Minnesota maintains thousands of acres of public parks for recreational activity. The vast majority of state-owned parks accommodate motor homes, campers, and tents; many have buildings that the state leases to the public for one day or several days. The state cannot reasonably claim that no one occupying an owned or leased structure or shelter on state land has an expectation of privacy. Nor can the state argue that one who rents a structure the state owns in a state park rents with the understanding that there is no expectation of privacy in that structure and that law enforcement officers can enter any time and inspect the occupants and the interior for a "proper park use permit" and/or any illegal activity.

Probably 99.9% of traffic crimes take place on "public highways" and/or "public streets." The state has never argued that, in prosecuting crimes against the state committed on public roads, a "shroud appears over constitutional guarantees" of due process and fairness. Public officials in public buildings who embezzle, steal, or otherwise misappropriate public funds are entitled to the same constitutional guarantees of due process and fairness as individuals who are not on public property. Until now, no one has ever argued the contrary.

■ The state argues that taking too many fish is a theft of property from the state, committed on public waters, and that the crime somehow becomes the product of a commercial enterprise, so constitutional guarantees are limited. *See New York v. Burger*, 482 U.S. 691, 707, 107 S.Ct. 2636, 2646, 96 L.Ed.2d 601 (1987) (concluding junkyard operator engaged in vehicle dismantling has reduced expectation of privacy because business is closely regulated). We see no difference between stealing too many fish from the state and going onto state-owned land and stealing timber or firewood. A citizen accused of stealing firewood or fish has the same constitutional guarantees of fairness and due process as citizens accused of other crimes. Again, the opposite has never before been argued.

## III. Locked door

The state points out that by law fish houses cannot be locked from the inside. *See* Minn.Stat. § 97C.355, subd. 3 (2000) (prohibiting any person from using a fish house unless door is constructed so it can be opened from outside when in use). Thus, the state argues that the constitutional prohibition against warrantless entries does not apply and that conservation officers have the right to enter fish houses at any time without any justification. We are not persuaded by this argument. Under Minnesota law, for public safety and/or fire safety reasons, numerous structures are required to be kept open during the time when it is anticipated the structure will be used and occupied by members of the public. *See, e.g.,* Minn.Stat. § 299F.30, subd. 3 (2000) (requiring all doors and exits of schools to be kept unlocked from inside during school hours).

■ Unlocked doors are the norm in all public buildings in Minnesota where the public comes and goes during normal operational hours. Obviously, all retail establishments of any kind have unlocked doors hoping the public will come in to shop. In these unlocked buildings, the Minnesota Constitution and the Bill of Rights remain firmly in place for occupants. Unlocked doors do not vaporize rights to privacy and constitutional limitations on search and seizure. The district court in *Krenz*, when suppressing evidence found inside the fish house, cited *State v. Sorenson*, 441 N.W.2d 455 (Minn.1989):

The court then addressed the stop of defendant's vehicle. The court determined that a conservation officer is subject to the same Fourth Amendment requirements as other law enforcement officers. *Id.* at 459 (citing *State v. Richards,* 284 N.W.2d 549 (Minn.1979)). The court rejected the state's argument that Minnesota Statute § 97A.205(2) gives the conservation officers broader powers: *"Of course, a statute cannot confer rights on law enforcement officers that the U.S. Constitution denies." Id.* "Searches by conservation officers are no less intrusive than police searches and the same possibilities exist for abuse." *Id.*

*State v. Krenz,* No. K7–00–1214, slip op. at 6 (Minn.Dist.Ct. Mar. 16, 2001) (emphasis added). The legislature does not have the power, by requiring doors to be unlocked, to do away with constitutional limitations and to exempt law enforcement officers from their scope.

## IV. Random Search and Seizures

■ The state takes the position that, on any lake in Minnesota, a conservation officer can select any fish house or houses at random, walk up, announce his title and simultaneously open the door and walk in to determine if the occupant has the necessary licenses and/or permits and is obeying all fishing regulations. The state claims that this power is inherent in conservation officers, and those officers often need no articulable suspicion of criminal activity, no probable cause, no warrant, etc. to search fish houses. The right of law enforcement officers to conduct random checks, the seminal constitutional issue here, is controlled by *Ascher v. Comm'r of Pub. Safety,* 519 N.W.2d 183 (Minn.1994). The issue of random checks of fish houses is not just similar to the random checkpoint stops of automobiles in *Ascher;* it is *precisely* like the *Ascher* checkpoint/roadblocks.

The public policy argument that the state put forth in *Ascher,* the state's interest in deterring drunken driving on our roads, was far more compelling than the public policy behind game and fish laws. Game and fish violations are commonly misdemeanors and gross misdemeanors, just like most driving violations, including the more serious misdemeanors and gross misdemeanors such as driving while intoxicated. Nothing sets a violation of the game and fish laws apart from all other crimes. The state cannot argue with logic or reason that conservation officers have more leeway to enter, detain, search, and seize in pursuit of a citizen who may have an extra walleye, duck, pheasant, or extra fishing line than law enforcement officers in pursuit of a citizen alleged to have committed armed robbery or murder!

We note that conservation officers are *law enforcement officers.* They are POST (Peace Officer Standards and Training) certified, authorized to carry handguns, handcuffs, and all other law enforcement equipment, and, within their own sphere and scope of jurisdiction, they are authorized to investigate, detain, arrest, seize, search, and question suspects. The seminal issue is, whether "conservation officers are under the same constitutional constraints as other law enforcement officers in the performance of their duties?" The question is the answer, and is its own citation. The state points to nothing that puts Minnesota conservation officers outside the pale of constitutional law.

In *Ascher,* the Minnesota Supreme Court acknowledged the state's public-policy argument of deterring drunk drivers and then went on to find unequivocally that *random checkpoint stops violated the Minnesota Constitution.* The specific holding was:

Exercising our independent authority to interpret our own state constitution to protect the rights of the citizens of Minnesota, we have engaged in a judicial determination of the reasonableness of the use of a temporary roadblock to stop a large number of drivers in the hope of discovering evidence of alcohol-impaired driving by some of them and have concluded that it violates Minn. Const. art. I, § 10, which we have long held generally requires the police to have an objective individualized articulable suspicion of criminal wrongdoing *before* subjecting a driver to an investigative stop.

*Id.* at 187 (citation omitted).

The *Ascher* court acknowledged a different interpretation by the United States Supreme Court on random checkpoints:

In *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the United States Supreme Court, in a decision written by Chief Justice Rehnquist, used this test in concluding that use of temporary roadblocks to stop and investigate all drivers in the hope of catching some alcohol-impaired drivers does not violate the Fourth Amendment.

The Court began its analysis by stating the obvious: "No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it."

*Id.* at 185 (quoting *Sitz*, 496 U.S. at 451, 110 S.Ct. at 2485). The *Ascher* court then pointed out that the U.S. Supreme Court appeared interested only in results:

Pointing to evidence that such roadblocks result in drunken driving arrests of around one percent of all motorists stopped, the Court held that the state had established effectiveness. In summary, the Court said, "the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program."

*Id.* (quoting *Sitz*, 496 U.S. at 455, 110 S.Ct. at 2487) (citation omitted).

Minnesota does it differently. The *Ascher* court stated in pertinent part:

The real issue in this case is not, as some might phrase it, whether the police conduct in question is reasonable in some abstract sense, nor is it whether the police procedure is in some sense effective. Rather, the issue is whether the state has met its burden of articulating a persuasive reason for departure from the general requirement of individualized suspicion[.]

*Id.* at 186.

Today, the state argues that conservation officers need broader powers because it is reasonable and effective for them in the performance of their duties. The *Ascher* court answered the argument that checkpoint stops were effective in deterring drunken drivers by pointing to the Minnesota Constitution. We point out here that you simply substitute "random fish house entries" for "random checkpoint stops" and the issue rises to one of constitutional dimensions under the Minnesota Constitution. The state asked the question in *Ascher,* and the *Ascher* court answered the question.

Conservation officers are not prejudiced by *Sorenson, Ascher,* or this case. As respondent's attorney correctly argued, conservation officers have the same range of powers in the performance of their duties as all law enforcement officers, including: relying on personal observations, tips, and confidential informants, stopping and briefly detaining a person because of an objective articulable suspicion of crimi-

nal activity, arresting for crimes committed in their visual presence, arresting for probable cause without a warrant, searching based upon a warrant, or searching without a warrant under an enumerated exception, and so on and so forth.

Since statehood, the Minnesota Constitution and the Bill of Rights have served well the judiciary, the prosecution, the criminal defense bar, and law enforcement officers. These twin documents embody the right and the obligation given to conservation officers to work under, to work with, and to recognize the historical limitations on the power of state government over its citizens. Neither any other group of law enforcement officers, nor the attorney general's office on their behalf, has ever challenged this obligation.

## IV. LEGISLATIVE BYPASS

The state next argues that the Minnesota Legislature has made the conduct of the conservation officer in *Krenz* and in this case lawful. The state quotes specifically Minn.Stat. § 97A.215, subd. 3(1), which states: "An enforcement officer may, at reasonable times: (1) enter and inspect the premises of an activity requiring a license under the game and fish laws[.]"

We have no quarrel with the statute. It is simply a restatement of the obvious. The key phrase and limitation is "at reasonable times." The legislature, if it wants to, can legislate that any law enforcement officer, including, without limitation, state highway patrol, county sheriffs, city police, conservation officers, etc., may enforce, *at reasonable times*, all criminal laws. That would be a nice-sounding statement of public policy, and no one would argue with it. But what the legislature may not do by statute is bypass the Bill of Rights and/or Minnesota Constitution. We read into the phrase "at reasonable times" the final authority of the Minnesota Constitution and the United States Constitution. We read this into the phrase because, as a judiciary, we must.

This precise battle over a legislative attempt to override a constitutional guarantee was fought out in the United States Supreme Court in *Dickerson v. United States,* 530 U.S. 428, 437, 120 S.Ct. 2326, 2332, 147 L.Ed.2d 405, (2000) (stating "Congress may not legislatively supersede our decisions interpreting and applying the Constitution" (citation omitted)).

The relevant setting in *Dickerson* is as follows:

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the U.S. Supreme Court held that certain warnings had to be given to a suspect before any incriminating statements made by him during custodial interrogation could be admitted in evidence. Just two years after *Miranda* was decided, the U.S. Congress enacted 18 U.S.C. § 3501, which purported to state that confessions would be admissible evidence if voluntarily given. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, § 701, 82 Stat. 197, 210–11 (1968) (codified as amended at 18 U.S.C. § 3501 (1994)). Voluntariness would be decided under 18 U.S.C. § 3501 with or without the giving of the Miranda warning. That statute lay idle for approximately 30 years as the justice department and law enforcement must have realized that the U.S. Congress probably cannot overrule the U.S. Supreme Court and its interpretation of the Bill of Rights. Then law enforcement decided to give it a try and found a federal appellate court to go along with them in upholding the constitutionality of 18 U.S.C. § 3501. The U.S. Supreme Court took the case on certiorari and said, "No, you can't do that."

*State v. Baumann,* 616 N.W.2d 771, 776 (Minn.2000) (Randall, J., concurring specially), *review denied* (Minn. Nov. 15, 2000).

In *Dickerson,* the majority stated:

Given § 3501's express designation of voluntariness as the touchstone of admissibility, its omission of any warning requirement, and the instruction for trial courts to consider a nonexclusive list of factors relevant to the circumstances of a confession, we agree with the Court of Appeals that Congress intended by its enactment to overrule *Miranda.* Because of the obvious conflict between our decision in *Miranda* and § 3501, we must address whether Congress has constitutional authority to thus supersede *Miranda.* If Congress has such authority, § 3501's totality-of-the-circumstances approach must prevail over *Miranda's* requirement of warnings; if not, that section must yield to *Miranda's* more specific requirements.

The law in this area is clear. This Court has supervisory authority over the federal courts, and we may use that authority to prescribe rules of evidence and procedure that are binding in those tribunals.

\* \* \* \*

In sum, we conclude that *Miranda* announced a constitutional rule that Congress may not supersede legislatively. Following the rule of *stare decisis,* we decline to overrule *Miranda* ourselves. The judgment of the Court of Appeals is therefore *Reversed.*

*Dickerson,* 530 U.S. at 436–47, 444, 120 S.Ct. at 2332, 2336–37 (citations and footnote omitted).

■ This limitation on Congress to legislatively supersede the Bill of Rights has a counterpart in the limitation on a state legislature to supersede its own state constitution. Here, Minnesota's relevant constitutional guarantee against unreasonable stops and seizures is embedded in the Minnesota Constitution, Article I, Section 10. A state legislature can establish the law, but it cannot override its own state constitution. We can only conclude that, if the Minnesota legislature wanted to make a generic public policy statement in Minn. Stat. § 97A.215, subd. 3(1), it had the right to. But we cannot conclude from subdivision 3(1) that the legislature expressly intended to authorize the entry and the search and seizure method used in this case and in *Krenz.* We have not yet amended the Minnesota Constitution to so provide.

Our answer is simple. If the county attorney, the county sheriff, the chief of police, and all other law enforcement personnel in the performance of their sworn duties are subject to the Minnesota Constitution and the United States Constitution, so also are Minnesota conservation officers. No other rational answer can be given.

To paraphrase the holding in *Krenz,* the state still has not explained to the judiciary why the enforcement of game and fish laws is outside the scope of the historical constitutional limitations on the power of government.

### DECISION

The district court correctly concluded that the constitution applies to conservation officers. So do we.

**Affirmed.**