**Robert McCAUGHTRY, et al., Appellants,**

v.

**CITY OF RED WING, Respondent.**

**No. A10–332.**

Court of Appeals of Minnesota.

June 11, 2012.

---

Anthony B. Sanders, Lee U. McGrath, Institute for Justice, Minnesota Chapter, Minneapolis, MN, Dana Berliner, pro hac vice, Institute for Justice, Arlington, VA, for appellants.

John M. Baker, Kathryn N. Hibbard, Greene Espel P.L.L.P., Minneapolis, MN, for respondent.

Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for amicus curiae League of Minnesota Cities.

Teresa Nelson, American Civil Liberties Union of Minnesota, St. Paul, MN, for amicus curiae American Civil Liberties Union.

Jarod M. Bona, DLA Piper U.S. LLP, Minneapolis, MN, for amicus curiae St. Paul Association of Responsible Landlords.

Considered and decided by BJORKMAN, Presiding Judge; HALBROOKS, Judge; and COLLINS, Judge.

## OPINION

COLLINS, Judge.*

Appellants Robert McCaughtry, et al., are landlords and tenants who have opposed the issuance of administrative warrants to conduct inspections of rental property and have sought declaratory judgments finding the applicable municipal ordinance unconstitutional. The district court concluded that appellants lacked standing and granted summary judgment for respondent City of Red Wing on appellants' claims. The court also denied the city's application for administrative warrants, but the city did not appeal. By unpublished opinion, this court affirmed the determination that appellants lacked standing to seek a declaratory judgment. *McCaughtry v. City of Red Wing*, No. A10–332, 2010 WL 3744638 (Minn.App. Sept. 28, 2010). The supreme court reversed, concluding that appellants' facial challenge under the Minnesota Constitution to the ordinance allowing inspections based on administrative warrants presents a justiciable controversy. *McCaughtry v. City of Red Wing*, 808 N.W.2d 331, 339

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

(Minn.2011). The supreme court remanded for this court "to consider the merits of appellants' challenge to the Red Wing rental inspection ordinance under the Minnesota Constitution." *Id.* at 341. We requested supplemental briefing from the parties and now affirm the summary judgment on other grounds.

## FACTS

The facts are not in dispute. As the district court indicated, "[t]he record makes it clear that much of the rental housing in Red Wing is aging, that some of the properties have never been inspected internally, and that an external inspection is insufficient to determine internal conditions." A study commissioned by the city found significant problems with rental housing, including lack of maintenance and violations of building and safety codes. *See McCaughtry*, 808 N.W.2d at 333. The study recommended adoption of a rental inspection program. *Id.* An ordinance providing for the inspection of "rental dwellings" was initially adopted in 2005 and later amended; the version addressed in the district court and by the parties was codified as Red Wing, Minn., City Code § 4.31 (2008), entitled the Rental Dwelling Licensing Code (RDLC).[1]

The RDLC requires an inspection to obtain a seven-year operating license, but owners of rental property may obtain temporary two-year permits until an operating license is issued. RDLC § 4.04, subd. 1(A)(1), 1(A)(2), 1(c). Inspections are to be scheduled with the consent of the property owner and "the primary tenant" of occupied rental units. *Id.*, subd. 1(C)(8). If the city does not obtain consent for the inspection, the city may seek permission to conduct the inspection "from a judicial offi-

cer through an administrative warrant." *Id.*, subd. 1(C)(9). Inspections are limited to looking for code violations: they must be scheduled during ordinary business hours (unless otherwise arranged, at the request of the owner or tenant); owners and tenants are entitled to be present during inspections; photographs and video recordings are generally prohibited; inspectors may not "open containers, drawers, or medicine cabinets" without consent from the tenant; other cabinets and closets may not be opened unless "reasonably necessary" to check for code violations; information relating to code violations may be recorded by the inspector, but not other information about the condition of the unit or its occupants; and disclosure to law enforcement is prohibited, unless required by law, necessary to abate a methamphetamine lab or the mistreatment of minors, vulnerable adults, or animals, or if necessary to obtain police protection for the housing inspector, after a threat of bodily harm. *Id.*, subd. 1(C)(10)-(17).

Appellants have successfully challenged the city's applications for administrative warrants to inspect the rental property they own or occupy under the current and previous versions of the city's housing code, and those denials are not before us. But the district court also rejected appellants' challenge to the facial validity of the RDLC. In this court, appellants argue unequivocally that "no administrative warrants are permitted under the Minnesota Constitution." They urge us to construe the language of the Minnesota Constitution in a manner dramatically different from the Supreme Court's interpretation of the nearly identical Fourth Amendment of the United States Constitution and to

---

1. The ordinance has been renumbered, and is now found at Red Wing, Minn., City Code § 4.04 (2011). For the convenience of those more likely to have access to the current version of the RDLC, we will refer to the current version throughout this opinion, as the supreme court did in its decision. *See McCaughtry*, 808 N.W.2d at 333–34.

adopt arguments specifically rejected by the Supreme Court 45 years ago. The propriety of doing so is the sole issue before us on remand.

## ISSUE

Should Article 1, Section 10, of the Minnesota Constitution be interpreted to require individualized probable cause of a code violation in a particular building, as a prerequisite to the issuance of an administrative search warrant, even though that position was rejected by the United States Supreme Court when it interpreted the Fourth Amendment of the United States Constitution 45 years ago?

## ANALYSIS

■■■ "[A]ppellants are presenting a facial challenge to the constitutionality of the ordinance." *McCaughtry,* 808 N.W.2d at 339. That challenge "does not depend on the contents of any administrative warrant application because a facial challenge asserts that a law *always* operates unconstitutionally" and it "presents a purely legal question that does not require the development of a factual record." *Id.* (quotation omitted). A constitutional challenge involves a question of law subject to de novo review, and the reviewing court is not bound by the district court's decision. *Hamilton v. Comm'r of Pub. Safety,* 600 N.W.2d 720, 722 (Minn.1999). But "local ordinances are presumed valid and will not be declared unconstitutional unless clearly shown to be so." *Arcadia Dev. Corp. v. City of Bloomington,* 552 N.W.2d 281, 285 (Minn.App.1996), *review denied* (Minn. Oct. 29, 1996).

The Minnesota Supreme Court has held that Article I, Section 10 of the Minnesota Constitution is "textually identical to the Fourth Amendment"[2] and decisions of the

United States Supreme Court interpreting the Fourth Amendment are "inherently persuasive." *State v. Wiegand,* 645 N.W.2d 125, 132 (Minn.2002). Interpreting the Minnesota Constitution differently may be justified if recent decisions by the United States Supreme Court constitute "a sharp departure from previous decisions" or "a radical departure from precedent." *Id.*

In 1967, the Supreme Court held that a nonconsensual and warrantless search of a residence by a municipal housing inspector violates the Fourth Amendment. *Camara,* 387 U.S. at 534, 87 S.Ct. at 1733. But that holding was "the beginning, not the end, of [the Court's] inquiry." *Id.* The Court recognized the nearly "unanimous agreement among those most familiar with this field that the only effective way to seek universal compliance with the minimum standards required by municipal codes is through routine periodic inspections of all structures." *Id.* at 535–36, 87 S.Ct. at 1734. No matter how substantial the public interest in protecting health and safety, that is not determinative, because citizens also have "a very tangible interest in limiting the circumstances under which the sanctity of [the] home may be broken by official authority." *Id.* at 531–33, 87 S.Ct. at 1732–33.

In *Camara,* the Court held that housing inspections should not be conducted without a warrant issued after a showing of reasonableness and a balancing by the decision-maker of "the need to search against the invasion which the search entails." *Id.* at 536–37, 87 S.Ct. at 1735. "[P]robable cause to issue a warrant to inspect" may be established by the existence of "reasonable legislative or administrative standards for conducting" inspections in a particular

**2.** There are minor variations in punctuation, and the state constitutional provision includes one use of the plural for "person," but we

defer to the supreme court's determination that the provisions are substantially identical.

area, which standards "may be based upon the passage of time, the nature of the building . . ., or the condition of the entire area." *Id.* at 538, 87 S.Ct. at 1736 (quotation omitted). But the required standards "will not necessarily depend upon specific knowledge of the condition of the particular dwelling." *Id.* The Court specifically rejected the complaining tenant's argument that "warrants should issue only when the inspector possesses probable cause to believe that a particular dwelling contains violations of the minimum standards prescribed by the code being enforced." *Id.* at 534, 87 S.Ct. at 1734. In short, the arguments being made by appellants before this court are identical to those rejected in *Camara.* And this court has previously recognized *Camara* as controlling authority, when concluding that administrative warrants for housing inspections were properly issued and enforceable by civil contempt. *In re Search Warrant of Columbia Heights v. Rozman,* 586 N.W.2d 273, 275–76 (Minn.App.1998), *review denied* (Minn. Jan. 21, 1999).

■ Appellants argue that we should disregard the holding in *Camara* and interpret the Minnesota Constitution to preclude the issuance of administrative warrants. The decisions of our supreme court have "established a definite baseline for how [to] approach the task of interpreting a provision of the Minnesota Constitution, especially when there is an identical or substantially similar federal counterpart." *Kahn v. Griffin,* 701 N.W.2d 815, 828 (Minn.2005). An appellate court should "approach this task with restraint and some delicacy" and must not "depart from federal precedent or the general principle that favors uniformity with the federal constitution," absent a "clear and strong conviction that there is a principled basis for greater protection . . . under the Minnesota Constitution." *Id.* When deciding whether to interpret the Minnesota Constitution as providing an independent

basis for the protection of individual rights, the first step is to determine whether the language in the state constitution "is different from the language used in the U.S. Constitution" or it "guarantees a fundamental right that is not enumerated in the U.S. Constitution." *Id.* If "both constitutions use identical or substantially similar language," the reviewing court will "take a more restrained approach." *Id.*

As indicated above, our supreme court has previously held that Article I, Section 10 of the Minnesota Constitution is "textually identical to the Fourth Amendment" and that decisions of the Supreme Court interpreting the Fourth Amendment are "inherently persuasive." *Wiegand,* 645 N.W.2d at 132; *see also State v. Harris,* 590 N.W.2d 90, 97 (Minn.1999) (indicating that Article 1, Section 10 of the Minnesota Constitution, precluding unreasonable searches and seizures, "is identical to the provision against unreasonable searches and seizures found in the Fourth Amendment"). Accordingly, this factor clearly weighs against a departure from federal precedent.

■ The state constitution may be interpreted differently if the reviewing court concludes that the "United States Supreme Court has made a sharp or radical departure from its previous decisions . . . and when we discern no persuasive reason to follow such a departure," especially if "the Supreme Court has retrenched on Bill of Rights issues, or if we determine that federal precedent does not adequately protect our citizens' basic rights and liberties." *Kahn,* 701 N.W.2d at 828. But *Camara* dates back 45 years, and appellants have not identified any court or commentator that has described it as a "retrenchment" on individual rights. In fact, a leading commentator calls *Camara* "an extremely important and meaningful concept which has proved useful in defining the

Fourth Amendment limits upon certain other 'special' enforcement procedures which are unlike the usual arrest and search." 5 Wayne R. LaFave, *Search and Seizure* § 10.1(b) at 16 (4th ed.2004).

■ When litigants assert claims under the Minnesota Constitution, it is appropriate to consider the text of the state and federal constitutional provisions; the relevant history of those provisions; relevant state and federal caselaw, including cases from other states that may "have addressed identical or substantially similar constitutional language"; policy considerations of particular state concern; and "the context of the modern scheme of state jurisprudence." *Kahn*, 701 N.W.2d at 829. Appellants have not identified a single jurisdiction that has adopted the position they urge upon us; they have not addressed any history relating to the adoption and ratification of the state constitutional provision;[3] and they have not pointed to any policy considerations related to housing inspections that are of particular concern to Minnesotans. In addition, the cases on which they rely, and in which Minnesota courts have construed the state constitution to provide greater protection, are clearly inapposite.

Nearly all of the cases on which appellants rely involve searches directed at a particular person or location, for the specific purpose of gathering evidence of criminal activity, making them of limited persuasive value here. For example, it is undisputed that inspections of rental property constitute a search, even under federal law. For that reason, *State v. Carter*, 697 N.W.2d 199 (Minn.2005), holding that a dog sniff outside the rented storage locker of a criminal suspect under surveillance by police constitutes a search under the Minnesota Constitution (and thus, must be supported by reasonable, articulable suspicion of criminal activity), is not on point. It is also undisputed that landlords and tenants have a reasonable expectation of privacy in rental property, under federal law. *See Camara*, 387 U.S. at 534, 87 S.Ct. at 1733. *State v. Larsen*, 650 N.W.2d 144 (Minn.2002), holding that an owner and occupant of a fish house has a reasonable expectation of privacy under the Minnesota Constitution and that this expectation is violated when a conservation officer enters without consent, a warrant, or probable cause, is also not pertinent to our analysis of a facial challenge to an ordinance that requires both warrants and probable cause, as defined in *Camara*. *See id.* at 534–35, 87 S.Ct. at 1734. Other cases cited by appellants are also clearly distinguishable and not persuasive on the question presented here. *See, e.g., In re Welfare of B.R.K.*, 658 N.W.2d 565 (Minn. 2003) (holding that short-term social guest has reasonable expectation of privacy and standing to object to warrantless search of home).

We now turn to one Minnesota case concluding that searches not based on individualized suspicion are unconstitutional, *Ascher v. Comm'r of Pub. Safety*, 519 N.W.2d 183 (Minn.1994). The supreme court there held that a temporary sobriety checkpoint, at which "a large number of

---

**3.** Appellants acknowledge that Minnesota courts have usually looked first at history related to the Fourth Amendment, citing *State v. Jackson*, 742 N.W.2d 163 (Minn.2007). That case determined that a nighttime search of a home was unreasonable under the Fourth Amendment, the supreme court did not reach the defendant's argument under the Minnesota Constitution, and the court specifically cit-ed and relied on the balancing test articulated in *Camara*. *Jackson*, 742 N.W.2d at 177, 180. Accordingly, it weighs against our departure from the Supreme Court's decision in *Camara*, especially because the RDLC does not authorize nighttime searches and the case before us does not involve a criminal investigation.

drivers" had been stopped without individualized suspicion of criminal wrongdoing, was invalid under the state constitutional provision prohibiting unreasonable searches and seizures. *Ascher*, 519 N.W.2d at 187. The opinion does not cite or discuss *Camara*, perhaps because it involved vehicle stops, which have traditionally been analyzed differently from searches of dwelling places; because police were seeking to apprehend and deter drivers who were alcohol-impaired, rather than to enforce housing codes; or because the case focused on seizures, rather than on searches. *See id.* at 184 (describing purposes of roadblock).

In *Ascher*, our supreme court concluded that the United States Supreme Court had recently and radically departed from previous decisions, and that the articulated reasons for that departure were unpersuasive. *Id.* at 186 (declining to follow *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)). The court characterized *Mich. Dep't*, which held that "use of temporary roadblocks to stop and investigate all drivers ... does not violate the Fourth Amendment," as a significant departure from well-established precedent requiring "individualized articulable suspicion of criminal wrongdoing" for vehicle stops. *Id.* at 184–86.

The court also noted that law enforcement officers had notified media representatives of their plans and that two television stations were covering "the roadblock, using lights and cameras to film ... in the ... area where those suspected of DWI were tested," without any restrictions on what they could film or disseminate. *Id.* at 184. Unlike the media representatives, who received advance notice, drivers had no notice of the roadblock until they "could not circumvent it." *Id.* Once the vehicles were stopped, officers interviewed drivers, "looking for indicia of intoxication and making sure each driver possessed a valid license." *Id.* (quotation omitted). Drivers who were "suspected of a violation" were then subjected to additional screening and "further investigation, including field sobriety tests and a computer check for outstanding warrants." *Id.*

By contrast, the case before us does not involve seizures, vehicle stops, criminal prosecutions, media coverage of persons being investigated for possible criminal prosecution, or an operation run by law enforcement independent of limitations that may be imposed by a judicial officer's issuance of search warrants. Nor is *Camara* a recent and radical departure from long-standing precedent that restricted administrative searches. Others may argue that the progeny of *Camara* represent a departure from the standards articulated there, but that is not the question before us today. *See* Eve Brensike Primus, *Disentangling Administrative Searches*, 111 Colum. L.Rev. 254, 291–92 (2011) (identifying *Mich. Dep't*, the case criticized by our supreme court in *Ascher*, as "the most salient example" of a trend toward the expansion of "dragnet" searches and seizures not requiring individualized suspicion).

Just as our supreme court in *Ascher* was concerned about the unfettered discretion of law enforcement officers conducting the sobriety checkpoint, the United States Supreme Court in *Camara* identified the risk that individuals would be subject "to the discretion of the official in the field" as one of the sources of the constitutional violation that results from warrantless searches. *See Camara*, 387 U.S. at 532, 87 S.Ct. at 1733; *Ascher*, 519 N.W.2d at 184. The RDLC that is being challenged by appellants here clearly limits the discretion of housing inspectors in the field. The court in *Ascher* was understandably concerned that law-abiding citizens would be swept up in the pursuit of drunk drivers

through use of the checkpoint, and held that was impermissible in light of "the state's failure to meet its burden in articulating a persuasive reason for dispensing with the individualized suspicion requirement." *Ascher*, 519 N.W.2d at 187. But the *Camara* court specifically addressed the interests of "law-abiding citizen[s]" to be protected from "the possibility of criminal entry under the guise of official sanction." *Camara*, 387 U.S. at 530–31, 87 S.Ct. at 1732. And there is an additional reason to require individualized suspicion before making a valid warrantless stop of a vehicle in drunk-driving cases: drunk-driving behavior is more readily discernible from the driver's conduct on a roadway in public, unlike a code violation.

Finally, we reject appellants' assertion that a recent Supreme Court decision characterizing the use of a GPS device on a criminal suspect's vehicle as a search under the Fourth Amendment compels us to ignore *Camara*. *See United States v. Jones*, —— U.S. ——, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). *Jones* did not cite *Camara*, the police in *Jones* were conducting a targeted investigation into criminal activity, and there is no dispute that inspections conducted pursuant to the RDLC would constitute searches.

Because Article I, Section 10 of the Minnesota Constitution is virtually identical to the Fourth Amendment, because we find the decision of the United States Supreme Court in *Camara* persuasive, because there has been no recent or radical departure from existing precedent governing administrative searches, and because appellants have not established a strong reason to depart from federal precedent, we reject appellants' assertion that all administrative warrants that might be issued under the RDLC are unconstitutional under the Minnesota Constitution. When denying past warrant applications, the district court in this case has paid particular

attention to the need to protect tenant privacy interests, which is entirely appropriate. We limit our opinion to the issue that was remanded by the supreme court, namely whether the RDLC is always unconstitutional, without regard to "the contents of any administrative warrant application," or warrant that may be issued by a court in the future. *See McCaughtry*, 808 N.W.2d at 339.

## DECISION

The district court properly granted summary judgment to the city. Appellants have not established that the RDLC is unconstitutional on its face under the Minnesota Constitution on the ground that it permits the issuance of administrative search warrants by a judicial officer, without an individualized showing of suspicion that particular code violations exist in the rental dwelling to be inspected.

**Affirmed.**